Ronald A. and Helen V.
HANSON, Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 301–85C.

United States Claims Court.

Oct. 30, 1987.

Kurt M. Anderson, St. Paul, Minn., attorney of record, for plaintiffs.

Howard Lipper, Washington, D.C., with whom was Asst. Atty. Gen. Richard K. Willard, for defendant.

## OPINION

REGINALD W. GIBSON, Judge:

Plaintiffs, the former Mr. and Mrs. Ronald A. Hanson,[1] have brought suit for damages against the Farmers Home Administration (FmHA or defendant), for the alleged violation of their rights under certain specified FmHA regulations and also for breach of an alleged implied-in-fact contract. Said violation and/or breach resulted in defendant's alleged failure to make sufficient loans to plaintiffs, as agreed, to enable them to purchase the additional cows required to assure the profitable operation of their dairy farm.

This case is now before the court on defendant's motion to dismiss for lack of subject matter jurisdiction and, in the alternative, its motion for summary judgment. Plaintiffs have also filed for a partial summary judgment on the broad issue of liability. They aver, however, that the issue as to the amount of damages is not ripe for summary judgment.

Plaintiffs have asserted jurisdiction under 28 U.S.C. § 1491, based on the violation of certain statutes, and federal regulations of the executive department, and upon an implied-in-fact contract.[2] We fail to find subject matter jurisdiction in this court based on either the violation of regulations and statutes, or on the breach of an implied-in-fact contract, for the reasons dis-

---

1. Plaintiffs were divorced and both remarried during the period of this litigation. Further, Mr. Hanson died on February 23, 1986.

2. In plaintiffs' motion to amend (dated March 21, 1986), which was granted by this court on October 9, 1987, they moved to strike their due process claims as concededly beyond the jurisdiction of this court.

cussed below. Therefore, the court grants defendant's motion to dismiss.

## I. FACTS

In or about 1977, plaintiffs began farming near the town of Oak Harbor, Washington. At that time they—had previously leased the 100 acres that they were then farming, had a small herd of 40 dairy cows, and also owned several head of beef cattle. Mr. Hanson was engaged in off-farm employment.

On September 19, 1977, the Hansons submitted their first loan application to the FmHA. Their primary stated purpose was to increase their dairy herd from 40 to 80 cows. The County Committee met on September 27, 1977, to consider same and rejected this loan application.[3] By letter dated October 12, 1977, the Hansons received notice of the foregoing County Committees' decision. In said letter of October 12, 1977, the then County Supervisor,[4] Mr. Hershey, explained that plaintiffs would have to first "build all new essential farm buildings and fully stock and equip the operation" to qualify as an "adequate family dairy farm," capable of meeting the loan and repayment requirements of FmHA.

Within a few days following the denial of plaintiffs' first application, they reapplied, submitting documents showing that they were endeavoring to follow the County Supervisor's directives, set out in the letter of October 12, 1977, that they become an "adequate family dairy farm." Thereafter, on October 26, 1977, the County Committee certified plaintiffs eligible for an operating loan of $50,000 and two of plaintiffs' older children for youth loans of $8,000 each that were used to buy cattle. The Hansons signed the promissory note for said operating loan on January 24, 1978. This loan was the first in a series that plaintiffs

obtained from FmHA to renovate their dairy operation.

Next, the Hansons applied for an operating loan of $100,000 under the Farm Ownership program on January 26, 1978. The County Committee certified them eligible for this loan. However, on February 8, 1978, the County Committee recertified the Hansons for the loan of $100,000 under the Economic Emergency loan (EE loan) program due to the County Supervisor's decision to use the funds available under the Economic Emergency loan program and to conserve the funds under the Farm Ownership program. Plaintiffs were to use this loan to pay for dairy equipment, to make initial cow purchases, and to pay certain farm expenses.

Prior to their second application for an economic emergency loan, on September 28, 1978, plaintiffs met with County Supervisor Hershey to revise their 1978 Farm and Home Plan on August 9, 1978. Plaintiffs had originally designed this plan on November 18, 1977, with a revision on March 28, 1978. The plan documented plaintiffs' current financial obligations and their proposal to use and repay FmHA loans. The prior certifications by the County Committee were based on plaintiffs' annual Farm and Home Plan for 1978. This 1978 plan reflected plaintiffs' goal of rebuilding their existing dairy farm facilities and purchasing additional cows, up to 150, to generate the income critically necessary to support their debt.

On October 2, 1978, the County Committee again certified plaintiffs as eligible for an economic emergency loan—this time the amount was $145,000. Plaintiffs were to use this loan to repay interim financing for construction of dairy facilities and for dairy equipment. Subsequent to receiving this loan approval, on October 31, 1978, plaintiffs exercised their option to purchase the

---

**3.** The County Committee is composed of three local farmers who function to determine whether a borrower is eligible for a loan. 7 U.S.C. §§ 1982, 1983 (1981); 7 C.F.R. §§ 1800.4, 1831.-7.

**4.** The County Supervisor has the actual authority to approve a loan. If the County Committee

appropriately certifies the applicant as eligible, the County Supervisor determines whether the plan is feasible, whether the loan is to be used for authorized purposes, and whether the applicant can repay the loan. 7 C.F.R. § 1831.14; see also Dahl v. United States, 695 F.2d 1373, 1379 (Fed.Cir.1982).

100 acre farm that they had previously leased. The terms of the sale were $35,000 in cash and a promissory note for $169,000. Additionally, during the period from March 21, 1978 through December 21, 1978, plaintiffs contracted for the renovation of their facilities and also incurred non-FmHA debt as interim financing.

The County Supervisor's office received the funds for plaintiffs' two economic emergency loans (totalling $250,000) on November 30, 1978. On the same day, plaintiffs executed the promissory note for the loan of $105,000 from the FmHA.[5] Prior to the receipt of these funds, Mr. Hershey had been replaced by Ms. Deborah Nunnally as County Supervisor on or about October 31, 1978. Plaintiffs subsequently signed the promissory note for the $145,000 loan on January 4, 1979. However, these funds, totalling $250,000, were not disbursed to plaintiffs until January 27, 1979. On or close to the date of disbursement, the FmHA paid off plaintiffs' contract for the purchase of 40 cows with $35,000 of the proceeds from the loan for $105,000.

The FmHA received a Farm and Home Plan for 1979 from the Hansons on January 2, 1979, as a predicate for obtaining additional loans. Soon thereafter, on January 6, 1979, plaintiffs applied for a third economic emergency loan to facilitate the purchase of additional cows. In conjunction with this loan application, the County Committee made a field visit to the Hansons' farm on or about March 29, 1979. The January 6th loan application was, thereafter, rejected by the County Committee on April 5, 1979. The Committee discussed the application again on April 20, 1979, but it was rejected again at the Committee's meeting on May 18, 1979. The Hansons signed a chattel security agreement on May 18, 1979, securing their prior FmHA loans. The County Supervisor wrote to the Hansons on May 21, 1979, informing them of this rejection. County Supervisor Nunnally cited Mr. Hanson's agreement to purchase 300 head of dairy cattle from South Dakota dairy breeder Hanstra, without the knowledge of FmHA, as part of the reason for this rejection. While the Hansons had represented to the FmHA that they were in fact holding these cattle in quarantine for the breeder as a source of income, on April 26, 1979, Mr. Hanstra appeared at the County Supervisor's office to inquire why he had not been paid for the past shipment of cattle under the sale contract with the Hansons.

After the denial of their application for the third economic emergency loan by the County Supervisor on April 6, 1979, plaintiffs began the process of pursuing administrative appeals. First they appealed to the State Director and obtained an informal hearing on July 25, 1979. At this hearing, the former County Supervisor, Mr. Hershey, stated that:

> ... it was fully expected that what would happen is that such time as the parlor and equipment and the buildings had been completed that we would go back in on an operating loan under the new increased limits and additional EE [Economic Emergency] loans and finance additional cow purchases to reach the cow herd size that we had anticipated.
> \* \* \*
> It was anticipated right from the start that we would expand that herd [to 150 cows], yes, in order to adequately support the debt load....

The decision of the initial appeal was adverse to plaintiffs, upholding the local committee decision. On October 9, 1979, plaintiffs next appealed to the FmHA Assistant Administrator at the Department of Agriculture, Washington, D.C. The Washington State Director submitted *ex parte* correspondence opposing plaintiffs' loan to the Assistant Administrator by letter dated November 27, 1979. The Assistant Administrator's decision, on January 25, 1980, was also adverse to plaintiffs, finding that plaintiffs had not fulfilled their responsibilities and obligations to FmHA. On February 24, 1980, plaintiffs appealed the Assistant Administrator's decision. Again, the

---

**5.** Neither party's submissions make clear why the actual amount of the loan ($105,000) exceeded the amount certified by the County Committee ($100,000).

Washington State Director submitted *ex parte* correspondence opposing plaintiffs' loan to the FmHA National Administrator. Thereafter, on May 22, 1980, Administrator Cavanaugh upheld the decision of the Assistant Administrator, James Lee, against plaintiffs. On or about June 23, 1980, Administrator Cavanaugh informed plaintiffs that his decision of May 22, 1980, constituted the exhaustion of plaintiffs' administrative appeal rights.

Throughout the duration of these appeal proceedings, defendant only released assigned proceeds from the sale of plaintiffs' milk to purchase feed and pay the expenses of repairing the dairy equipment. During this same time period, defendant also refused to subordinate its security interests to allow plaintiffs to obtain conventional financing. Further, on July 23 and 31, 1980, defendant demanded that plaintiffs liquidate the livestock which constituted the security for the FmHA loans. After the rejection of their third loan application, plaintiffs became delinquent in repayment of their FmHA loan and of their real estate mortgage for the farm. The FmHA, as a consequence, chose to accelerate their loan on November 4, 1980. Plaintiffs appealed the foreclosure of the lien against their property and were given an informal hearing on March 21, 1981. On May 5, 1981, the decision of foreclosure was upheld. FmHA repossessed the chattel securing their loans on June 25, 1983. The foreclosure and acceleration were withdrawn by a letter from the FmHA dated February 17, 1984. But a foreclosure sale of the 100–acre farm was held in 1984.

## II. CONTENTIONS OF THE PARTIES

### A. *Plaintiffs' Contentions*

The plaintiffs advance several arguments on which they base their jurisdictional right to recover from the government. Basically, these arguments fit into two broad categories. First, plaintiffs allege breach of contract based on an implied-in-fact contract under which defendant had agreed to provide a series of loans, unlimited in amount, to plaintiffs to up-grade their dairy facilities and to increase their dairy herd to 150 cows. The implied-in-fact contract allegedly arose from the approval of plaintiffs' *initial* Farm and Home Plan (plan) in 1977 by the County Supervisor and County Committee. Plaintiffs maintain this was a comprehensive plan that served as the basis of their two Economic Emergency loans (EE loans) made in 1978 for capital improvements and was to also serve as the basis of a *third EE* loan to purchase a sufficient number of cattle to support the total FmHA debt load. Second, plaintiffs aggressively argue that the FmHA violated an array of regulations and statutes over the course of their lender-borrower relationship. These contentions, premised on regulations and statutes, are summarized below.

Initially, plaintiffs claim that the delay in the disbursement of the EE loan funds, from November 30, 1978, when the checks were received by the County Supervisor, to January 27, 1979, when the checks were disbursed, violated 7 U.S.C. § 1922 *et seq.*, 7 U.S.C. § 1961 *et seq.*, 7 C.F.R. Part 1943, and 7 C.F.R. Part 1945. In short, the consequences of said violations are that the government allegedly failed to close plaintiffs' loan within 20 working days of the receipt of the loan funds (*i.e.*, the check) by the County Supervisor and also failed to disburse the funds at or within 30 days of the loan closing. Plaintiffs cite 7 C.F.R. §§ 1943.2, 1943.35a, 1945.102, and 1945.-128(b) as the sections supporting their allegations of time requirements violated by defendant. The foregoing failures, aver plaintiffs, resulted in increased interest costs.

The government also violated 7 C.F.R. §§ 1910.3(a) and 1910.4(b), say plaintiffs, by the County Supervisor's failure to submit plaintiffs' original loan application to the County Committee for their determination of eligibility when plaintiffs applied for their third EE loan on January 6, 1979. According to plaintiffs' complaint, the County Committee considered an application revised by the County Supervisor, not their application as submitted.

When plaintiffs appealed the County Committee's denial of eligibility for their

third EE loan, defendant admits submitting *ex parte* statements to both the Assistant Administrator and Administrator at the national level of FmHA. Plaintiffs claim these submissions [6] violated their rights under 7 C.F.R. § 1900.53(f) and (g).

After the denial of the third loan application, FmHA partially refused to release the proceeds from plaintiffs' milk sales for operating and living expenses. Plaintiffs contend that this refusal violated their rights under 7 C.F.R. § 1962.17(c) (1980). During the same time interval, plaintiffs allege that FmHA denied their subordination requests thereby making it impossible for them to obtain conventional financing. In this instance, plaintiffs claim this refusal violated their rights under 7 C.F.R. § 1872.3. Further, plaintiffs complain that FmHA also failed to advise them of the availability of moratorium, deferral, consolidation, reamortization, and rescheduling services for their outstanding loans. Additionally, they argue, defendant did not consider and act on plaintiffs' requests for these services, thus violating plaintiffs' rights under 7 U.S.C. § 1981a and 7 C.F.R. §§ 1951.33, 1951.40, and 1904.124.

Finally, the repossession by FmHA on June 25, 1983, of plaintiffs' chattel pledged as security for their outstanding loans violated 7 C.F.R. § 1962.42 according to plaintiffs' argument. Plaintiffs have, therefore, moved for summary judgment on the issue of defendant's liability for the alleged breach of a contract implied-in-fact and for violation of the above-identified statutes and regulations.

### B. *Defendant's Contentions*

Defendant responds to plaintiffs' arguments by moving to dismiss the complaint and in the alternative also moving for summary judgment. These motions rest on the following four arguments by defendant. First, the Claims Court has no jurisdiction over plaintiffs' claims of violation of the specified statutes *and* regulations as said cited provisions do not directly mandate the recovery/payment of money damages against the United States. Second, avers defendant, plaintiffs' claim of an implied-in-fact contract is superseded by the conditional express contract evinced by the Chattel Security Agreement that plaintiffs signed on May 18, 1979. Under that document, plaintiffs agreed that the "Secured Party [*i.e.*, the government] would make or insure future loans or advances to Debtor [*i.e.*, plaintiffs] to enable him to raise or harvest farm crops or raise livestock or other animals, *provided* funds are available and *Debtor meets all the current requirements imposed by regulations* of the Secured Party" (emphasis added). Defendant argues that plaintiffs' contract claim must fail, therefore, since plaintiffs cannot show that they have met *all* of the operative requirements set forth in the FmHA regulations. The most significant of such failure is that they were not certified, as eligible for the third EE loan, by the County Committee as these regulations require.

Third, defendant contends that the implied-in-fact contract claim also fails because plaintiffs do not satisfy their affirmative burden to show that the County Supervisor possessed the necessary authority to bind the government to agree to fund plaintiffs' entire long-term Farm and Home Plan as plaintiffs contend. Finally, the government would not be estopped to deny the existence of an implied-in-fact contract since according to the regulations the County Supervisor would have acted outside of his authority, absent certification by the County Committee, in agreeing to fund the expenditures proposed in plaintiffs' long-term Farm and Home Plan. Further, plaintiffs have presented no evidence of misconduct on the part of either the County Committee or the County Supervisor. In order to estop the government, such a showing is required.

Against this background, the court will proceed to determine—whether in fact defendant violated the statutes and/or regulations enumerated by plaintiffs; and if it

---

**6.** Alleged *ex parte* contacts by documents dated—November 27, 1979; January 22, March 4, April 7, April 10, April 21, and April 28, 1980

(*see* Appendix to Plaintiffs' Memorandum of Law, pp. 40–45, 49–50, and 52–58).

did, whether any such violation gives rise to either an expressed or an implied right to compensation from the government so that plaintiffs' claim would be within this court's jurisdiction. The court will also examine plaintiffs' allegations of breach of an implied-in-fact contract to determine whether they state a claim within the jurisdiction of this court. Since the court fails to find subject matter jurisdiction, based on the foregoing allegations of plaintiffs, it will not rule on plaintiffs' motion for summary judgment.

### III. ISSUES

To pursue the jurisdictional analysis of plaintiffs' claims, the court will focus on the following issues: (i) whether the statutes and regulations cited by plaintiffs can be fairly read to mandate money damages due to their violation as alleged; (ii) whether an open-ended implied-in-fact contract arose between FmHA and plaintiffs due to the County Supervisor's approval of plaintiffs' 1978 Farm and Home Plan; and (iii) whether the government would be estopped to deny an implied-in-fact contract with plaintiffs.

### IV. DISCUSSION

#### A. *Background*

Under the Consolidated Farm and Rural Development Act of 1961 (CFRDA), 7 U.S. C. § 1921 *et seq.* (1987), the FmHA is authorized to make three types of conventional loans: real estate loans to acquire or improve farms (including farm buildings);[7] operating loans to improve operations, purchase livestock, and refinance existing debts;[8] and emergency loans to extend agricultural credit to temporarily meet the

needs of farmers and ranchers in areas affected by natural disaster.[9] The emergency loan program was amended in 1978 through the Emergency Agricultural Credit Adjustment Act (EACAA) of 1978 to include economic emergencies. Under the 1978 amendment, the FmHA is authorized to make loans to farmers and ranchers who are "not able to obtain sufficient credit elsewhere due to economic stresses, such as a general tightening of agricultural credit...." 7 U.S.C. note prec. § 1961 (1976 and Supp. II 1978). Thus, the foregoing FmHA program serves as a lender of last resort and, as a consequence, does not compete with commercial lenders.

Subchapter IV of the CFRDA provides for the implementation and administration of these loan programs. The Secretary of Agriculture is authorized under this subchapter to administer the program through local officials.[10] One of which is the position of the County Supervisor that is established under the Secretary's regulations.[11] The responsibilities of the County Supervisor include assisting loan applicants in completing Farm and Home Plans,[12] giving *final* approval for all loans,[13] supervising borrowers to protect the government's interest and to facilitate the borrower's achievement of the goal of the loan,[14] and determining the feasibility of the plans.[15]

The CFRDA also provides for the establishment of County Committees in aid of administering such loan programs.[16] The Secretary requires that for *all* loans made through the FmHA, except water and waste facility loans, guaranteed rural housing loans, soil conservation district loans, and loans to farm cooperatives, that the County Committee—

---

7. 7 U.S.C. §§ 1922–1934 (1979). The relevant text of all pertinent cited statutes and regulations is found in the discussion *infra* or in the Appendix.

8. 7 U.S.C. §§ 1941–1947 (1979).

9. 7 U.S.C. §§ 1961–1970 (1979).

10. 7 U.S.C. § 1981(a) (1979).

11. 7 C.F.R. § 1800.23. (Note: All referenced sections of the Code of Federal Regulations are from the 1979 Code unless otherwise stated.)

12. 7 C.F.R. § 1924.57(c).

13. 7 C.F.R. § 1901.3(a).

14. 7 C.F.R. § 1924.59(a) and (b).

15. 7 C.F.R. § 1924.57(c)(5).

16. 7 U.S.C. § 1982 (1979).

... *certify in writing that the applicant meets the eligibility requirements* for *the* loan, and has the character, industry and ability to carry out the proposed operations, and will, in the opinion of the committee, honestly endeavor to carry out his undertakings and obligations....[17]

(emphasis added). Thus, on *each* loan made, the County Committee *must* certify the applicant as eligible, "for the loan," and the County Supervisor has the *final* authority to approve "the loan." However, it is noted and emphasized that the eligibility certification is a prerequisite to the final approval of the County Supervisor for all loans made under CFRDA.

Applicable regulations also require that each applicant/borrower, who is receiving a loan for a project requiring more than one year to complete, prepare a Long–Time Farm and Home Plan.[18] This plan represents the borrower's long-term objectives and is subject to revision when there are changes in the borrower's operation or use of loan funds.[19] Additionally, each applicant/borrower who receives an FmHA loan must also prepare an *annual* Farm and Home Plan.[20] The annual plan is also subject to revision.[21] The purpose of these plans is to provide a vehicle for achieving production and fiscal objectives, for making sound management decisions, and for aiding FmHA in making credit determinations.[22]

### B. *Defendant's Motion To Dismiss*

For purposes of addressing defendant's motion to dismiss, the court accepts all of plaintiffs' factual allegations as true. Next, it proceeds to determine whether plaintiffs have stated a claim, as a matter of law, within the jurisdiction of this court, either in terms of basing same on monetary relief due which may be fairly contemplated as stemming from statutory or regulatory violations or in terms of a breach of an implied-in-fact contract. For the reasons stated below, the court finds that it does not have jurisdiction over plaintiffs' claims, as alleged, based on violations of either statutes or regulations or on a breach of an implied-in-fact contract.

### 1. *Statutory Or Regulatory Violations As A Basis Of Jurisdiction*

The core jurisdiction of the Claims Court is defined by 28 U.S.C. § 1491 to embrace—

... any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States....

The courts have narrowly construed this jurisdictional statute to limit the claims cognizable in the Claims Court. *See United States v. Testan*, 424 U.S. 392, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976) (section 1491 is only jurisdictional; it does not, *ipso facto*, create a substantive right for money damages). Not every claim evolving from the Constitution, a federal statute or a regulation can be litigated in the Court of Claims (Claims Court)—the claim must be for money. *Eastport Steamship Corp. v. United States*, 178 Ct.Cl. 599, 605, 372 F.2d 1002, 1007 (1967) (violation of licensing regulations found not to imply a right to money damages). *See also United States v. King*, 395 U.S. 1, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969) (Court of Claims' jurisdiction limited to claims for money damages against the United States Government). The plaintiffs must allege that a specific statute or regulation, apart from § 1491, creates either an implied or express substantive right to receive monetary compensation from the government for damages. *Eastport*, 178 Ct.Cl. at 605, 372 F.2d at 1008. *See also United States v. Mitchell*, 463 U.S. 206, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983) (hereinafter *Mitchell II*), where the Court held

---

**17.** 7 U.S.C. § 1983(b) (1979).

**18.** 7 C.F.R. § 1924.57(d).

**19.** *Id.* at § 1924.57(f).

**20.** *Id.* at § 1924.57(e).

**21.** *Id.* at § 1924.57(f).

**22.** *Id.* at § 1924.57(a).

that the statute(s) created a fiduciary duty for government management of Indian lands and that breach of this duty implicated a right to money damages.

In order to meet this burden of establishing jurisdiction in this court, plaintiffs rely on a test for an implied right to money damages articulated in *Anderson v. United States,* 5 Cl.Ct. 573 (1984), *aff'd,* 746 F.2d 849 (Fed.Cir.1985). In *Anderson,* the court held that the claims of construction workers who were employed as temporary government employees were outside of the jurisdiction of the Claims Court because the statutes and regulations relied upon did not mandate the payment of compensation by the government. The *Anderson* test, as expressed by Judge Spector, provides that "[t]he Constitution, a statute, or a regulation should be 'fairly interpreted as mandating compensation' when: (i) [a] right to a benefit is thereby conferred; (ii) [t]he benefit is economic in nature; and (iii) [t]he [g]overnment breaches its duty to confer that benefit." *Id.* at 577 (quoting *Eastport,* 178 Ct.Cl. at 606, 372 F.2d at 1009). In *Anderson,* the court sought to extract specific guidelines from *Mitchell II* as a premise for implying a right to money damages by formulating the above test. *Anderson,* 5 Cl.Ct. at 577. In doing so, however, the *Anderson* court overlooked the precise method of determining when to imply a right to money damages as employed by the Supreme Court in *Mitchell II,* 463 U.S. at 218–219, 103 S.Ct. at 2968–2969, and in *United States v. Testan,* 424 U.S. 392, 399, 96 S.Ct. 948, 953, 47 L.Ed.2d 114 (1976) (misclassified government employees' claim was not based on statutes that created a substantive right to back pay). In these cases in determining jurisdiction, the Court framed the issue as being —whether the source of substantive law can "fairly be interpreted as mandating compensation by the Federal government for the damages sustained" as a result of a breach of the duties imposed by the substantive law. *Mitchell II,* 463 U.S. at 218, 103 S.Ct. at 2968. In its procedural analysis, the Court examined the face of the statute for an express bestowal of a right to *money damages. Id.* In the absence of

an *express* right, the Court next examined the legislative history for the intent of Congress regarding the type of duties imposed on the agency by the statute. *Id.* at 222, 103 S.Ct. at 2970. At this posture, the Court also examined the rights that arose as a result of the relationship established by the statutes and regulations. *Id.* at 226, 103 S.Ct. at 2972. Next, the Court focused on the regulations seeking out the purposes of the regulatory scheme and the responsibilities established by the regulations. *Id.* Finally, the Court inquired as to whether the recognition of a damages remedy would further the purposes of the statutes and regulations. *Id.* at 227, 103 S.Ct. at 2973.

In *Mitchell II,* American Indian plaintiffs brought suit against the United States for damages that resulted from the government's mismanagement of the timber resources on reservation lands. The Supreme Court, after applying the analysis outlined above, held that the statutes and regulations relied on had imposed a fiduciary duty on the government to manage these resources for the Indians' benefit. *Id.* at 226, 103 S.Ct. at 2972. The result of this creation of the trust obligation to benefit the Indians was that these statutes and regulations could, as a consequence, be fairly interpreted as mandating compensation for damages for the violation thereof. *Id.* The Court also found that money damages would further the purposes of the statutes and regulations in issue since they directed the Secretary of the Interior to use the timber resources to generate proceeds for the Indians. *Id.* at 227, 103 S.Ct. at 2973.

Applying the rationale of *Mitchell II* to the statutes and regulations in issue in the present case does not lead the court to conclude that the cited statutes and regulations can be fairly read to mandate compensation for damages resulting from the alleged government violations. The substantive law that plaintiffs allege to have been violated, in the case at bar, are the statutes authorizing the FmHA to make real estate (7 U.S.C. §§ 1922–1933) and emergency (7 U.S.C. §§ 1961–1970) loans to eligible indi-

viduals. Plaintiffs have, in error, cited the court to Subchapter I regarding real estate loans. However, Subchapter I is inapplicable here. According to the documents submitted by both parties, plaintiffs did not receive any loans under this subchapter. Rather, plaintiffs received loans only under Subchapter II, Operating Loans, and Subchapter III, Emergency Loans. Since plaintiffs have not alleged any violations of Subchapter II, *i.e.,* Operating Loans, as a basis for compensation, the court will now proceed to determine whether 7 U.S.C. §§ 1961–1970 can be fairly interpreted as mandating the payment of money damages.[23]

On the face of these sections, there is no express authorization for the payment of compensation for damages in violation thereof. Reference to the legislative history of the EACAA, which established the Economic Emergency loan program under which plaintiffs received two loans and were denied a third, reveals that the purpose of the Act was to amend the CFRDA to broaden and modernize the FmHA's lending authority in order to respond to the needs of farmers and ranchers suffering from a "general tightening of agricultural credit." H.R.Rep. No. 95–986, 95th Cong., 2nd Sess. 6, 11, *reprinted in* 1978 U.S.Code & Adm.News 1106, 1111, 1116. There is no mention in the legislative history of an intent, on the part of Congress, to compensate applicant farmers and ranchers for damages due to violations on the part of the FmHA in its loan-making function.

As a result of the lender-borrower relationship established by the EACAA, the right of farmers and ranchers to receive insured loans from FmHA is a conditional right. That condition is premised upon the Secretary's finding that there is a reasonable probability of repayment and upon the County Committee certifying that the applicant for an EE loan is eligible.[24]

■ Likewise the duty of FmHA to make EE loans under the implementing regulations is conditioned on the County Committee's review of the application and resulting determination that the applicant meets the EE loan requirements.[25] The purpose of the implementing regulations (7 C.F.R. §§ 1945.1—1945.150) is to make "adequate financial assistance available" to eligible applicants during the EE program period, which ran from August 4, 1978 to May 15, 1980.[26] Since the conditional duty imposed by the statutes and regulations, here at issue, are clearly distinguishable from the statutes and regulations that created an absolute *fiduciary* duty to manage Indian resources and remit proceeds from the sale of those resources involved in *Mitchell II,* this court does not see that recognition of a damages remedy would further the purposes of making loans available for a statutorily limited period to applicants who could *not* obtain credit elsewhere. Hence, we fail to find that a right to money damages can be fairly implied into 7 U.S.C. § 1961 *et seq.* or its implementing regulations stemming from a violation thereof.

---

**23.** *See* Appendix for pertinent text of the statutes relevant here: 7 U.S.C. §§ 1961, 1962 (1978) and note prec. § 1961.

**24.** 7 U.S.C. note prec. § 1961 (1976 Supp. II 1978), 7 U.S.C. § 1982 (1978).

**25.** 7 C.F.R. § 1945.113 provides:
County committee review.
 The county committee will review the application and determine whether or not the applicant meets EE loan eligibility requirements.
 (a) *Certification.* If the county committee finds the applicant eligible, it will prepare form FmHA 440–2, "County Committee Certification or Recommendation." This form will be retained in the county office file.

 (b) *Rejection.* If the county committee rejects the application, the county supervisor will inform the applicant in writing of the reasons for the rejection.
Plaintiffs argue that the County Committee's requirement for certification of eligibility does not apply to each loan application processed, but rather 7 C.F.R. § 1945.113 was amended in 1979, say plaintiffs, to clarify the fact that their initial eligibility certification applied to each and every loan application. *See* Supplementary Information to FmHA Economic Emergency Loans Final Rule published at 44 Fed.Reg. 75,-105 (1979) (to be codified at 7 C.F.R. Parts 1045 and 1980).

**26.** 7 C.F.R. § 1945.102.

Even under the *Anderson* test, *supra*, espoused by plaintiffs, we would not imply a right to money damages on the unequivocal facts here since the duty of the government to bestow an economic benefit is not absolute but is conditioned only on a determination of the applicant's eligibility by his peers serving on the County Committee.[27] Since we do not find that, as a matter of law, we can imply a right to money damages reasonably contemplated by 7 U.S.C. §§ 1961–1970, and the implementing regulations under which EE loans are made, plaintiffs' claims based on these sections must be dismissed as they do not come within the Claims Court jurisdiction.

Even assuming *arguendo* that the statutes and regulations cited to by plaintiffs could be fairly interpreted to mandate the payment of compensation for damages due to government violation, the court does not find on this record any such triggering violations. Below we shall examine each cited regulation and demonstrate that, on the uncontroverted facts, no violation occurred.

In their first claim, plaintiffs allege that FmHA violated 7 C.F.R. Part 1943 and 7 C.F.R. Part 1945 due to the 58–day delay in disbursing plaintiffs' certified and approved EE loan funds of $250,000. Said 58–day delay is premised on plaintiffs' allegation that the County Supervisor received the checks ($105,000 and $145,000) on November 30, 1978, and they were not disbursed to plaintiffs until January 27, 1979. 7 C.F.R. Part 1943 applies to the policies, procedures, and authorizations for making Farm Ownership loans,[28] Insured Soil and Water loans,[29] and Insured Recreation loans.[30] Since plaintiffs received an Operating loan in the amount of $50,000 (7 C.F.R. Part 1941) and two Economic Emer-

gency loans in the aggregate amount of $250,000 (7 C.F.R. Part 1945), the citations to Part 1943 are neither applicable to plaintiffs' claims nor helpful to their case.

In terms of the EE loans, plaintiffs allege that 7 C.F.R. §§ 1945.102 and 1945.-128(b) (1979) stand for the proposition that loan closing is to occur within 20 working days of receipt of the loan checks and that disbursement is to occur at or within 30 days of loan closing. Section 1945.102 states in pertinent part:

Program objectives.

The objective of EE loans is to make adequate financial assistance available during the period authorized by Pub.L. 95–334 (authority expires May 15, 1980), in the form of loans insured or guaranteed by FmHA for bona fide farmers and ranchers who are primarily and directly engaged in agricultural production so that they may continue their normal farming or ranching operations during the economic emergency which has caused a lack of agricultural credit due to national or area wide economic stress such as a general tightening of agricultural credit or an unfavorable relationship between production costs and prices received for agricultural commodities. . . .

Section 1945.128(b) states in pertinent part: "*Requesting check.* When the County Supervisor is reasonably certain that the EE loan *can* be closed within 20 days from the date of the check, loan funds *may* be requested at the time of loan approval . . ." (emphasis added).

From the text of the foregoing two regulations, it is clear that plaintiffs have misread their provisions. 7 C.F.R. § 1945.102 makes absolutely no reference to time requirements for the disbursement of loan

---

**27.** The court believes the *Anderson* test is overbroad and, thus, declines to adopt same.

**28.** *See generally* 7 C.F.R. § 1943 Subpart A; 7 C.F.R. § 1943.1 states in pertinent part: "This Instruction [Subpart A] outlines the policies and procedures, and authorizations for making Farm Ownership (FO) loans under the [CFRDA] . . ."

**29.** *See generally* 7 C.F.R. § 1943 Subpart B; 7 C.F.R. § 1943.51 states in pertinent part: "This

subpart outlines the policies, procedures, and authorizations for making Soil and Water loans under the [CFRDA] . . ."

**30.** *See generally* 7 C.F.R. Subpart C; 7 C.F.R. § 1943.101 provides in pertinent part: "This subpart outlines the policies, procedures, and authorizations for making Recreation (R) loans under the [CFRDA] . . ."

funds. On the other hand, 7 C.F.R. § 1945.128(b) simply sets out discretionary guidelines for the decision of the County Supervisor as to when he may request the loan check from the central FmHA disbursement office. This section does not refer to any mandatory time limits for either loan closing or disbursements. Therefore, they give plaintiffs no comfort. Because the County Supervisor's decision as to when to request the loan check is discretionary, the government would not be in violation of this regulation on the uncontroverted facts here. This is particularly true whereas here there is neither a showing nor an allegation of an abuse of discretion.

Plaintiffs also cite to 7 U.S.C. § 1922 *et seq.*[31] and 7 U.S.C. § 1961 *et seq.*[32] to support their position regarding mandatory time limits for loan closing and disbursement. However, again the court finds no reference in these sections as to time limits for either loan closings or loan fund disbursements. Consequently, in terms of the timing of the disbursement of plaintiffs' loan, the court finds no violations of either the statutes or regulations cited and must dismiss this claim.

In their second claim, plaintiffs allege that they believe that the County Supervisor submitted a revised application, not their original application, to the County Committee when plaintiffs sought a third EE loan. Save the bland allegation, plaintiffs offer—no supporting factual allegations as to the extent of any alleged revisions, no supporting affidavits, nor any other corroborative documentation as a basis for this claim. The established rule regarding legal conclusions proffered as factual allegations is that they are not given the presumption of truth and that conclusory allegations without any supporting facts are insufficient to withstand a motion to dismiss. *Briscoe v. LaHue*, 663 F.2d 713 (7th Cir.1981), *aff'd*, 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983) (without allegations of specific facts supporting plaintiffs' claim of conspiracy, the complaint failed to state a claim). We find, therefore, that plaintiffs' second claim is insufficient to withstand the government's motion to dismiss and must dismiss it for failure to state a claim upon which relief can be granted within the jurisdiction of this court.

In reference to plaintiffs' third claim, defendant admits that it did submit *ex parte* statements to the Assistant Administrator and to the Administrator of FmHA during plaintiffs' administrative appeal of the denial of their third loan. Plaintiffs cite 7 C.F.R. §§ 1900.53(f) and (g) (1979), as having been violated by the admitted conduct, which provide in pertinent parts as follows:

(f) If the appellant appeals to the review officer:

(1) Upon receipt of the appeal the review officer will request that the hearing officer forward the record to the review officer. The hearing officer will promptly do so.

(2) The review officer may obtain a copy of the transcript of the hearing if one was arranged for by the appellant.

   \*    \*    \*    \*    \*    \*

(4) If the appellant indicates a desire to present information in person, the review officer will arrange a meeting for the sole purpose of receiving such additional information. The meeting will be held within 15 calendar days of receipt of the appeal. A final decision will be rendered within 20 calendar days after the meeting.

   \*    \*    \*    \*    \*    \*

(g) Upon receipt of an appeal from a hearing review officer's decision, the administrator or a delegate will review the record, which will have been forwarded by the review officer upon receipt of a copy of the letter and determine whether the decision was arbitrary and capricious....

While assuming, but without deciding, that defendant violated some specific prohibition in said regulations, and plaintiffs point to no specific provision to have been violat-

---

**31.** See Appendix for pertinent text of these sections.

**32.** See Appendix for pertinent text of these sections.

ed, such a claim is nevertheless not within the jurisdiction of this court because 7 C.F.R. §§ 1900.53(f) and (g) do not expressly mandate the payment of money damages to compensate their violation. Moreover, we note a further reason why plaintiffs' claim must fail, and that is the submission of *ex parte* statements is a due process violation which also is not within the jurisdiction of this court. *Muehlen v. United States*, 209 Ct.Cl. 690, 529 F.2d 533 (1976) (Court of Claims has no jurisdiction over claims based on the Fifth Amendment due process clause). The third claim of plaintiffs is, thus, also outside our jurisdiction.

■ Next, plaintiffs seek relief for the alleged violation of 7 C.F.R. § 1962.17(c) (1980) which provides as follows: [33]

(c) *Distribution of income from normal income security.* On finding that the amount of income originally planned for the year will not be received, the County Supervisor will determine, in consultation with the borrower, how to use income that is available or will become available during the remainder of the planned year as shown on Forms FmHA 431–2 or FmHA 431–4. If other creditors have liens on the property from which the normal income is received, they also must be consulted. Priorities in distributing the income that will be available are as follows:

(1) Pay necessary farm, home, and other expenses planned for payment by cash as incurred.

(2) Prorate repayments on credit advanced for necessary farm, home, and other operating expenses to FmHA and other creditors.

(3) Make planned payments on other debts as shown in Table K of Form FmHA 431–2 or Table H of Form FmHA 431–3. However, minimum payments may be made on such debts along with the payment of cash farm, home, and other operating expenses on credit advanced for such purposes when neces-

sary to enable the borrower to keep essential property.

Plaintiffs allege a compensable violation of the foregoing regulation in that the government partially refused to release proceeds from the sale of plaintiffs' milk for operating and living expenses. The subsection to which plaintiffs cite, *i.e.*, 7 C.F.R. § 1962.17(c) (1980), is prefaced by § 1962.17, which states in pertinent part:

*Releasing chattel security.* Chattel security *may* be released *only* when release will not be to the financial detriment of FmHA. Borrowers will be strictly accountable to FmHA for the proper use of proceeds from the sale of security.

(Emphasis added.)

Chattel security includes *both* basic security and normal income security. *Id.* Basic security includes all equipment and initial animal herds that secure FmHA loans and serve as a basis for the farm operation set forth in the Farm and Home Plan. 7 C.F.R. § 1962.17(a). Normal income security includes all other crops, livestock, products and other property covered by FmHA liens which are sold in operation of the farm. 7 C.F.R. § 1962.17(b). Therefore, under § 1962.17, the County Supervisor has broad discretion as to when to release normal income security. No affirmative duty is imposed on the County Supervisor to release the proceeds from the sale of this security interest when such is not shown to be in the interest of FmHA. On the contrary, the responsibility of protecting the financial interests of FmHA limits the County Supervisor's discretion under this regulation. Under 7 C.F.R. § 1962.17(d), there are also express limits as to when a County Supervisor may release normal income security: (1) to pay debts to FmHA; (2) to pay farm operating expenses; (3) to pay debts resulting from farm operating expenses; (4) to pay income or social security taxes; (5) to pay creditors whose liens are superior to FmHA liens; and (6) to pay debts to creditors incurred

---

**33.** Plaintiffs cite to 7 C.F.R. § 1962.17(c) (1979); however, this regulation does not appear in the C.F.R. for 1979. Plaintiffs also cite to 7 C.F.R. Part 1900 without specifying which section is the basis of their claim.

due to essential real estate. In light of the restricted discretion delegated under this section, we therefore do not find that the cited regulation was violated. Further, plaintiffs' submissions show that on numerous occasions, subsequent to January 25, 1979, the County Supervisor did release proceeds from the sale of milk to plaintiffs to pay farm expenses.

Again, plaintiffs' complaint alleges no facts to support their conclusion that defendant violated their appeal rights under 7 C.F.R. Part 1900, Subpart B, Farmers Home Administration Appeal Procedures. Without facts, this legal conclusion cannot withstand the motion to dismiss. *Briscoe v. LaHue,* 663 F.2d 713 (7th Cir.1981), *aff'd,* 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed. 2d 96 (1983). We, therefore, must dismiss this claim alleging the failure to release certain proceeds from the sale of plaintiffs' milk.

■ For their fifth claim, plaintiffs allege that FmHA violated their rights under 7 C.F.R. § 1872.3 by failing to carefully consider their requests for subordination. Again, plaintiffs allege no facts to support this legal conclusion. However, from plaintiffs' submissions, it is apparent that the County Supervisor took the position that, due to the plaintiffs' appeal of the denial of their third EE loan application, no subordination agreement could be executed by FmHA. Nevertheless, we find that plaintiffs have cited the court to a section of the regulations that is inapplicable to the chattel security pledged for the FmHA loans that they have previously received. 7 C.F.R. Part 1872, Subpart A applies to servicing and liquidation of real estate security.[34]

The section that applies to the subordination of FmHA liens on chattel security is 7 C.F.R. § 1930.30 (1979).[35] Under this section, the approval of a subordination request is within the discretion of the County Supervisor.[36] This discretion is again limited by the County Supervisor's *responsibility* to protect the financial interest of FmHA.[37] Because it is evident that defendant refused to subordinate so as to protect the financial interest of the FmHA, we find that there was no violation of either 7 C.F.R. § 1872.3 or 7 C.F.R. § 1930.30.

■ The court finds that plaintiffs' sixth claim is based on an alleged violation of plaintiffs' due process rights and so it is not within our jurisdiction. The statutory basis of this claim is 7 U.S.C. § 1981a which provides in pertinent part:[38] "The Secretary *may* permit, at the request of the borrower, the deferral of principal and interest on any outstanding loan made, insured, or held by the Secretary under this Chapter...." (emphasis added). The failure to give notice of the right to request deferral would clearly be a due process violation. *Allison v. Block,* 723 F.2d 631, 634–635 (8th Cir.1983) ("rudimentary elements of adequate notice and opportunity to be heard are embodied in the language of § 1981a"). Once a plaintiff requests moratorium, deferral, consolidation, reamortization, and rescheduling services, 7 U.S.C. § 1981a requires the borrower to make a prima facie showing that due to circumstances beyond his control he is temporarily unable to continue making payments without unduly impairing his standard of living. The regulations under 7 C.F.R. § 1951.33 (1980) and § 1904.124 (1979) would control the approval of the request.[39] The County Supervisor is autho-

---

**34.** *See* 7 C.F.R. § 1872.1(a) which provides in pertinent part: *"Purpose.* The purpose of this subpart is to delegate authority and prescribe policies and procedures for servicing and liquidating real estate security ..." The court observes, and notes, that on occasions counsel has cited to inappropriate or non-existent code sections. Such a performance adds greatly to the burden on this court.

**35.** *See* 7 C.F.R. § 1930.30(a) and (b).

**36.** *See id.* at § 1930.30(e).

**37.** *See* 7 C.F.R. § 1930.30(c)(2)(iii).

**38.** *See* Appendix for entire text of 7 U.S.C. § 1981a. From plaintiffs' submissions, it appears that the acceleration of FmHA loan accounts was reversed on February 17, 1984.

**39.** *See* Appendix for the relevant text of 7 C.F.R. §§ 1951.33 and 1904.124. Section 1951.33 does not appear in 7 C.F.R. for 1979. Plaintiffs cite 7 C.F.R. § 1951.40, but this section is inapplicable as neither of plaintiffs' loans were made for real

rized to consolidate, reschedule, and defer loans.[40]

On the other hand, the regulations under 7 C.F.R. § 1951.33(b)(4) (1980) prohibit the County Supervisor from approving consolidation, rescheduling, or deferral, however, if the borrower's account is currently being serviced by the Office of General Counsel or the U.S. Attorney or will be referred to either office in the future.[41] Likewise, under § 1904.124(a)(2), which provides for renewal, amortization, and deferral, the services at issue are not available when the borrower's account is being serviced or may be referred to the Office of General Counsel or the U.S. Attorney.[42] In plaintiffs' case, the County Supervisor followed these regulations when, by letter dated June 16, 1979, she informed them that "[t]his request 'for consolidation, rescheduling and reamortization' is not being acted on at this time due to an anticipated appeal and subsequent hearing...." We hold that the government did not violate the cited sections; therefore, we must dismiss this claim.

■ Finally,[43] defendant allegedly violated 7 C.F.R. § 1962.42 (1983) due to the repossession of the chattels securing the plaintiffs' FmHA loans on June 25, 1983. This regulation provides in pertinent part that: "The County Supervisor will take possession of security ... for FmHA when the value of the property, based on appraisal, is substantially more than the estimated sale expenses and the amount of any prior lien.... [w]hen peaceable possession can be obtained, but the borrower has not executed Form FmHA 455–4" ["Agreement of Secured Parties to Sale of Secured Proper-

ty"]. *Id.* at § 1962.42(a)(1)(iii). The form that plaintiffs executed on May 18, 1979, pledging chattel security was Form FmHA 440–4, "Security Agreement." Since apparently the County Supervisor obtained peaceable possession, and plaintiffs make no allegations to the contrary, the above-cited section would apply. Consequently, we find no violation of this section even taking all plaintiffs' allegations as true and must therefore dismiss this claim.

### 2. *Breach of Contract Implied In Fact As A Basis Of Jurisdiction*

■ Plaintiffs also claim that the FmHA breached an implied in fact contract by denying them the third EE loan to increase their dairy herd to 150 cows after the County Supervisor and County Committee approved their initial Farm and Home Plan. It is fundamental that in order to establish an implied-in-fact contract, plaintiffs must show: (1) mutuality of intent to contract; (2) lack of ambiguity in offer and acceptance; and (3) authority to bind the government residing in the officer whose conduct was relied upon. *Pacific Gas and Electric Co. v. United States*, 3 Cl.Ct. 329 (1983) (plaintiff acted to benefit itself, not in reliance on government officer). Plaintiffs fail to meet their burden regarding these requisite showings. First, plaintiffs allege no facts showing mutuality of intent to contract as contended. The signing and approval of the initial Farm and Home Plan is not controlling here. Plaintiffs allege that they submitted a comprehensive Farm and Home Plan in 1978 that, as revised, served as the basis for their prior EE loans

---

estate purposes. The court is aware that the Eighth Circuit found 7 C.F.R. § 1951.33, promulgated under 7 U.S.C. § 1981a, to be inadequate in terms of the due process requirements of the Fifth Amendment in *Allison v. Block*, 723 F.2d 631, 636 (8th Cir.1983). However, plaintiffs here are contending that the regulations as then codified were violated. Plaintiffs realize that this court is an inappropriate forum for their due process challenges.

**40.** 7 C.F.R. § 1951.33(b).

**41.** 7 C.F.R. § 1951.33(b)(4).

**42.** 7 C.F.R. § 1904.124(a)(2).

**43.** Plaintiffs' claims under 7 C.F.R. Part 1900 and 7 C.F.R. § 1962.40 (1980) are due process claims which plaintiffs withdrew in their motion to amend their pleading which the court granted on October 9, 1987. Again the court is cognizant of the fact that the District Court in *Coleman v. Block*, 580 F.Supp. 194, 208 (S.W.N. D.1984), found the regulations regarding liquidation of mortgaged chattels to be inadequate in terms of due process requirements of the Fifth Amendment. But plaintiffs do not challenge the validity of the regulations here—only whether they were in fact violated.

and authorized the third EE loan. But the original and subsequent plans submitted by plaintiffs were Annual Farm and Home Plans (Form 431–2) and not a Long–Time Farm and Home Plan (Form 431–1). Additionally, this originally submitted plan was subject to revision,[44] and plaintiffs revised said plan on several occasions. Moreover, the regulations specifically state that eligibility for a specific EE loan *must* be determined by the County Committee.[45] As to such a loan application, it was not forthcoming from the County Committee.

Plaintiffs argue, however, that this certification of eligibility requirement only applies to the *initial* loan application. We find that plaintiffs have misread the applicable regulations inasmuch as they were amended in 1979 to clarify the requirement of eligibility certification for each and every loan application made under the EE loan program.[46] Further, plaintiffs fail to meet their burden because they make no affirmative showing of the County Supervisor's authority to waive these regulations governing eligibility requirements.

■ Now the plaintiffs argue that the government should be estopped from denying the implied-in-fact contract to make the third EE loan. But to invoke estoppel against the government, plaintiffs must present probative facts going to the establishment of the following elements: (1) the party to be estopped must know the facts; (2) he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended; (3) the asserter of estoppel must be ignorant of the true facts; and (4) he must rely on the former's conduct to his injury. *See Glopak v. United States,* 12 Cl.Ct. 96 (1987) (court denied plantiff's claim that government should be estopped from enforcing price adjustment clause). *See also United States v. Georgia–Pacific*

*Co.,* 421 F.2d 92 (9th Cir.1970) (government estopped from enforcing contract that it had terminated).

Even taking all of plaintiffs' allegations as true, they set forth no facts establishing these operative elements. There are no factual allegations from which it may be reasonably inferred that the government intended plaintiffs to act merely on a revisable annual Farm and Home Plan. Moreover, in the complaint, there are no facts alleged establishing that plaintiffs were ignorant of the process and requirement for certification. On the contrary, plaintiffs' submissions show that all of plaintiffs' previous loan applications were processed in the same manner, *i.e.,* requiring the County Committee's certification of eligibility as to each loan application. Plaintiffs had knowledge at such times of this requirement. Finally, without a showing of affirmative misconduct by the government agent, the defendant may not be estopped from acting in compliance with valid regulations. *Schweiker v. Hansen,* 450 U.S. 785, 788, 101 S.Ct. 1468, 1470, 67 L.Ed.2d 685 (1981) (Social Security Administration was not estopped from denying retroactive benefits even though agency's representative made erroneous statements); *see also Urban Data Systems Inc. v. United States,* 699 F.2d 1147, 1153 (Fed.Cir.1983) (" 'United States is not bound by its agents acting beyond their authority and contrary to regulation' "), *citing Federal Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947). Again, there are no facts showing misconduct by the County Supervisor. In light of plaintiffs' failure to make the necessary factual showing to support their conclusory allegations, the court must dismiss their claim based on breach of an implied-in-fact contract as not stating a claim within the jurisdiction of this court.[47]

---

**44.** *See* 7 C.F.R. § 1924.57(f).

**45.** *See* 7 U.S.C. § 1983 and 7 C.F.R. § 1961.113.

**46.** *See* note 25 *supra.*

**47.** Defendant argues that the signing of the chattel security agreement by plaintiffs on May 18, 1979, created an express contract whose terms replaced the alleged implied-in-fact contract. But this express contract would only apply to subsequent, future loan applications. The loan application at issue was submitted on January 6, 1979, prior to the signing of the chattel security agreement.

## V. CONCLUSION

For the foregoing reasons, the court grants defendant's motion to dismiss, for lack of subject matter jurisdiction, of all of plaintiffs' claims. We, therefore, find that it is not necessary to reach either party's motion for summary judgment. The Clerk shall enter judgment dismissing plaintiffs' complaint. Costs to the prevailing party.

IT IS SO ORDERED.

## APPENDIX

7 U.S.C. § 1922. Persons eligible for loans.

(a) The Secretary is authorized to make and insure loans under this subchapter to farmers and ranchers in the United States, and to farm cooperatives and private domestic corporations, partnerships, and joint operations that are controlled by farmers and ranchers and engaged primarily and directly in farming or ranching in the United States, subject to the conditions specified in this section. To be eligible for such loans, applicants who are individuals ... must (1) be citizens of the United States, (2) have either training or farming experience that the Secretary determines is sufficient to assure reasonable prospects of success in the proposed farming operations, (3) be or will become owner-operators of not larger than family farms ... and (4) be unable to obtain sufficient credit elsewhere to finance their actual needs at reasonable rates and terms, taking into consideration prevailing private and cooperative rates and terms in the community in or near which the applicant resides for loans for similar purposes and periods of time.

7 U.S.C. § 1923. Purposes of loans

(a) Preferences

Loans may be made or insured under this subchapter for (1) acquiring, enlarging, or improving farms, including farm buildings, land and water development, use and conservation, (2) recreational uses and facilities, (3) enterprises needed to supplement farm income, (4) refinancing existing indebtedness, and (5) loan closing costs.

7 U.S.C. Note Prec. § 1961—Subchapter III—EMERGENCY LOANS

"SHORT TITLE

"Sec. 201. This title may be cited as the 'Emergency Agricultural Credit Adjustment Act of 1978.'

## "AUTHORITY TO INSURE OR GUARANTEE LOANS

"Sec. 202. The Secretary of Agriculture may insure or guarantee loans to (1) bona fide farmers and ranchers who are primarily and directly engaged in agricultural production and who are citizens of the United States and ... if the applicant for such loan—

"(A) has the experience or training and resources necessary to assure a reasonable prospect for successful operation with the assistance of such loan;

"(B) needs such credit in order to maintain a viable agricultural production operation; and

"(C) is not able to obtain sufficient credit elsewhere due to economic stresses, such as a general tightening of agricultural credit or an unfavorable relationship between production costs and prices received for agricultural commodities.

\* \* \*

## "PURPOSES OF LOANS

"Sec. 203. (a) Loans may be insured or guaranteed under this title for (1) refinancing outstanding indebtedness, ... (2) reorganization of the farming, ranching, ... operation, ... (3) purchase of essential water rights, supplies, and irrigation facilities, (4) purchase of essential livestock, poultry, and farm equipment, (5) purchase of feed, seed, fertilizer, insecticides, and farm supplies ..., (6) financing essential land and water development, use, and conservation, (7) other essential farm, ranch, and aquaculture needs, ... (8) loan closing costs.

\* \* \*

## "LOAN CERTIFICATION AND CONDITIONS

"Sec. 205. (a) As a condition of the Secretary's guaranteeing any loan under this title, the lender shall certify that—

\* \* \*

"(c) As a condition of insuring or guaranteeing any loan under this title, the Secretary must find that there is reasonable probability of accomplishing the objectives of this title and repayment of the loan.

"(d) The Secretary shall require—

"(1) the county committee authorized under section 332 of the Consolidated Farm and Rural Development Act [section 1982 of this title] to certify in writing that the applicant for a loan under this title meets the eligibility requirements for the loan, has the character, industry, and ability to carry out the proposed operations, and will, in the opinion of the committee, honestly endeavor to carry out the applicant's undertakings and obligations[.]

7 U.S.C. § 1961.  Eligibility for loans

(a) Persons eligible

The Secretary shall make and insure loans under this subchapter ... to (1) established farmers, ranchers, or persons engaged in aquaculture, who are citizens of the United States and who are owner-operators ... or operators ... of not larger than family farms, ... where the Secretary finds that the applicants' farming, ranching, or aquaculture operations have been substantially affected by a natural disaster[.]

7 U.S.C. § 1962.  Loan determination factors; written credit declinations

(a) For the purpose of determining whether to make or insure any loan under this subchapter, the Secretary shall take into consideration the net worth of the applicant involved, including all the assets and liabilities of the applicant.

(b) For the purpose of determining whether an applicant under this subchapter is not able to obtain sufficient credit elsewhere, the Secretary shall require at least one written indication of declination of credit, from a legally organized lending institution within reasonable proximity to the applicant, that specifies the reasons for the declination[.]

7 C.F.R. § 1910.3  Receiving applications.

(a) All persons applying for FmHA assistance who are not indebted to FmHA must file a written application.  Any person wishing to submit an application will be permitted to do so.  No oral or written statement may be made to applicants or prospective applicants that would discourage them from applying for assistance, based on any ECOA "prohibited basis."

7 C.F.R. § 1910.4  Processing applications.

*     *     *

(b) *Determining eligibility.*  * * * All farmer program applications are to be submitted to the County Committee for eligibility.  The County Supervisor must obtain and present to the County Committee sufficient information concerning an applicant for the Committee to determine eligibility for the type of assistance requested.

7 C.F.R. § 1930.30 Subordination and waiver of FmHA liens on chattel security.

(a) *Annual operating expenses.*  FmHA liens on chattels and crops may be subordinated to permit applicants and borrowers to obtain all or part of the credit they need for annual operating expenses from other sources, provided any junior lienholders consent in writing to the subordination and to their liens remaining subordinated to FmHA liens.

*     *     *

(c) *Authorized operating and EM loan purposes.*  (1) FmHA may subordinate chattel liens securing an operating loan to a creditor to permit that creditor to lend for any authorized operating loan purpose including capital purchases under the following conditions:

(i) The borrower has had substantial financial losses as a result of contamination of food crops, animal feed, livestock or livestock products by toxic chemicals and has not been fully compensated for them.

(ii) The borrower has a reasonable chance to accomplish the loan objective.

(iii) The Administrator approves the subordination.

(2) The FmHA may subordinate chattel liens securing EM loans to another creditor

to permit that creditor to lend for any authorized EM loan purpose including capital purchases provided:

(i) The borrower needs the loan to continue farming operations.

(ii) The loan will help the borrower to accomplish the objectives of his/her FmHA loans.

(iii) FmHA's financial interest will not be adversely affected.

\*　　\*　　\*

(e) *Approval.* Loan approval officers may approve subordinations and waivers of FmHA lien priority if the amount of the proposed subordination or waiver, plus the principal balance of existing subordinations or waivers, are not more than their loan approval authority for the type of loan being subordinated stated in tables which are available from [FmHA].

7 C.F.R. § 1951.33 Deferral, consolidation and rescheduling of OL, EM and EE loans made for Subtitle B purposes.

All borrowers are expected to repay their loans according to planned repayment schedules. However, circumstances may occur which will not permit borrowers to pay as scheduled or to refinance the loans. This section explains how to consolidate, reschedule, and defer installments on *existing* loans providing the borrower agrees to such actions.

\*　　\*　　\*

(b) *General requirements.* County Supervisors are authorized to approve, consolidate, reschedule and defer loans. When the County Supervisor determines that consolidation, rescheduling and deferral will assist in the orderly collection of the loan, the County Supervisor should take such action, provided:

(1) Such action is not used in lieu of or to delay liquidation;

(2) Such action is not taken to only remove a delinquency;

(3) Such action is not taken to circumvent FmHA's graduation requirements;

(4) The borrower's account is not being serviced by OGC or the U.S. Attorney, and there are no plans to have the account serviced by either of these offices in the near future;

(5) The County Supervisor determines that the borrower is making satisfactory progress or will make satisfactory progress with revised repayment terms; and

(6) The borrower is cooperating in servicing the account and is maintaining the security.

\*　　\*　　\*

(d) *Consolidated and rescheduling EE and EM loans.* EE and EM loans made for real estate purposes will *not* be consolidated and rescheduled under any circumstances. EE and EM loans made for operating purposes may be consolidated and rescheduled subject to all of the following conditions:

(1) EE and EM loans may be consolidated and rescheduled when it is in the best interests of the borrower and the government.

7 C.F.R. § 1904.124 Renewal, reamortization of loans and deferment of installments.

All borrowers are expected to repay their Farmer Program loans according to the planned repayment schedule. However, circumstances may occur which will not permit them to pay as scheduled or to refinance their loans. This section explains how to reamortize or renew a loan and defer installments on existing loans.

(a) *Eligibility requirements.* (1) For Farmer Program loans the principal and interest balance on a loan note may be reamortized or renewed ... and/or installments may be deferred, as appropriate, when it is determined it will be in the best interest of the borrower and the Government....

(2) Farmer Program loan notes will not be reamortized, renewed or deferred when the account is being serviced or may be serviced in the near future by the State Officers or has been referred to OGC or to the U.S. Attorney.

\*　　\*　　\*

(4) *Deferment of installments.* \* \* \* The use of deferral authority will generally involve loans made to beginning farmers,

borrowers with limited income and resources, and borrowers who have had production and economic losses because of natural or economic conditions.... Deferred installments may be authorized under the following conditions:

(i) The farm and home plan shows that scheduled installments cannot be made during the deferred period.

(ii) The scheduled installments cannot be made for reasons which are beyond the control of the borrower.

(iii) The borrower has acted in good faith and has properly maintained and accounted for security.