NIES, Circuit Judge.
 

 This appeal is from the final judgment
 
 [1]
 
 of the United States Claims Court holding the Government contractually liable for overtime usage of a building leased from L.S.S. Leasing Corporation (lessor) during the period from September 1972, to November 30, 1974. Lessor’s additional claim for usage prior to September 1972 was held to be barred by the statute of limitations set forth in 28 U.S.C. § 2501 (1976).
 
 [2]
 
 We modify-
 

 Background
 

 The Social Security Administration, Department of Health and Human Services, has been occupying an entire building under a lease entered into June 1,1966. The lease runs until May 31,1991, and had apparently been modified at least 22 times by the time this suit was filed. Two of these modifications, Supplemental Agreements 10 and 22 (S.A. 10 and S.A. 22, respectively), are of concern here.
 

 The original lease, in what was denominated Schedule “B” and entitled “Maintenance and Service Provisions,” required the lessor to furnish: (1) heat and air conditioning; (2) porter service; (3) alternating current; (4) hot and cold running water and sewerage; (5) passenger and freight elevator service; (6) chilled drinking water; (7) snow and ice clearance; and (8) a limited number of parking spaces. These services were to be provided during “tenant working hours” identified as Monday through Friday, 8:00 a.m. to 6:00 p.m., and Saturday, 8:00 a.m. to 1:00 p.m. (except federal holidays). Schedule “B,” ¶ 2. In addition, outside the “tenant working hours,” the lessor was obligated to furnish heat or air conditioning and elevator service upon four hours’ written notice from the Government. Schedule “B,” ¶ 3, “Overtime Services.”
 
 *1361
 
 The lessor was entitled to the actual costs of overtime heat and air conditioning, up to a maximum of $100 per hour. No compensation was paid for electricity for lighting or for use of the building or other building services after tenant working hours. The “Overtime Services” provision further required: “Each invoice submitted by the lessor for overtime heat or air conditioning ... shall itemize the actual cost and shall be subject to audit.”
 

 One room of the building, identified as the “Computer Room” (hereinafter as Computer Room One), received special treatment. Computer Room One, which housed the agency’s computer systems, was to be provided “heat or airconditioning to maintain proper environmental conditions for the equipment and power for lighting” 24 hours per day, seven days a week, and “electricity for the equipment [estimated at 20 KVA], which will operate approximately 16 hours per day, 5 days per week.” Schedule “B,” ¶4, “Computer Room Services.”
 

 At the time the lease was entered into, it was the Government’s expectation that its overtime use of the building would be negligible. However, with the subsequent enactment by Congress of the Medicare Program and its resulting impact upon the Social Security Administration’s workload, overtime use of the building increased dramatically. This, in turn, led to a significant increase in non-compensable costs to the lessor while simultaneously imposing a burdensome overtime audit procedure upon the Government. Within a year, it had become obvious to the parties that, because of changed circumstances, the overtime provisions of the lease were no longer fair or practicable.
 

 Negotiations were undertaken to resolve the problems posed by this mutually disadvantageous overtime payment scheme. What resulted was S.A. 10 which modified Schedule “B,” ¶ 3 by (1) eliminating the previous auditing procedures and (2) setting a single flat fee of $53 per hour for each hour of “overtime services requested by, and furnished to, the Government ... irrespective of the numbers of floors or portions worked or the number of hours worked.” All services specified in Schedule “B,” ¶2 were to be provided during overtime. S.A. 10 was drafted by the Government and made retroactive to July 4, 1966.
 

 Under S.A. 10, a self-monitoring procedure developed wherein the Government would verify its overtime usage and report such usage on both a weekly and a monthly basis to the lessor and Government Services Administration (GSA); the lessor would then bill GSA for each hour at $53 per hour; and GSA would remit payment to the lessor.
 

 Although the $53 per hour rate was in effect for some time and seemed satisfactory, by 1972 that rate had become unprofitable for the lessor. On May 30,1972, lessor contacted GSA and demanded additional compensation asserting that (1) the lessor’s overtime costs had risen to $126 per hour (this figure was later revised to $168); (2) the number of Government employees occupying the building had increased substantially; and (3) the Government’s overtime use had increased to almost a full double-shift, a marked increase over what had been contemplated when S.A. 10 was entered into.
 

 GSA’s Office of Audits conducted a review of building use and overtime costs and, initially, determined that the lessor’s contentions were unjustified. However, upon further investigation, GSA did find that the lessor’s costs had risen to about $106 per hour.
 

 In an effort to find out for himself why costs had gotten out of hand, lessor’s vice-president, Mr. Daniel E. Walzer, made an early-morning check of the building in August of 1974. At 5:00 a.m. he found Computer Room One in operation and was informed by a computer room employee that the computer facilities had been used regularly for two or three shifts per day for several years. Prior to this discovery, Mr. Walzer had been unaware of this extensive use of the computer room which was greatly in excess of the overtime hours reported by the Government.
 

 
 *1362
 
 Mr. Walzer’s pre-dawn encounter resulted in a demand by him for an accounting covering the overtime hours in Computer Room One. He also informed GSA that the computer’s electricity consumption had been “for sometime in excess of the 20 KVA permitted by the Lease.”
 

 GSA conducted a check of employee records which verified that Computer Room One had been in almost constant operation, that is, with employees present. An additional discovery was that the Government had constructed another computer room (hereinafter Computer Room Three) which had been operational since January 1974 and had also been heavily used. Without a precise audit of payroll records, the Government estimated that, since the inception of the lease, Computer Room One had been used 22,614 hours in addition to any hours which would have been included in any previously reported overtime use of the building, and that Computer Room Three had been used during 1,144 hours not previously reported, but that these hours were concurrent with Computer Room One hours.
 

 With the “report” of overtime usage in hand, Mr. Walzer proceeded to submit an invoice for overtime compensation in accordance with previous billing procedures. In response, the Government took the position that no overtime usage had occurred because the lessor was under an obligation to provide continuous computer room services. Any incidental use of the rest of the building (i.e., washrooms, elevators, etc.) by employees outside of that room was, in the Government’s view, de
 
 minimis.
 
 The lessor, naturally, disagreed.
 

 Notwithstanding their sharp differences, the parties negotiated to achieve an amicable settlement for overtime use of both computer rooms. However, the national office of GSA’s Public Buildings Service rejected the proposed settlement, taking the view that the Government’s liability was limited to payment for excess electricity.
 

 After further negotiations, the parties entered into S.A. 22 which provided for a lump sum payment for excess electrical consumption and released the Government from all claims except the following:
 

 a) For overtime services performed by the Lessor for the period December 1, 1966 through August 31, 1972, being a total of 16,059 hours for services performed in Computer Room No. 1 (constructed at the inception of the lease and also known as the main computer room) at the rate of $53.00 per hour for a total of $851,127.
 

 ******
 

 b) For overtime services performed by the Lessor for the period September 1, 1972 through November 30, 1974, being a total of 3,630 hours for services performed in Computer Room No. 1 (constructed at the inception of the lease and also known as the main computer room) at the rate of $53.00 per hour for a total of $192,390.00.
 

 c) For overtime services performed by the Lessor for the period January 1, 1974 through November 30, 1974, a total of 1,144 hours, for services performed in Computer Room No. 3 (constructed and operational on January 1, 1974, and also known as the SSADARS area) at the rate of $53.00 per hour for a total of $60,-632.00.
 

 There is no language in S.A. 22 indicating that “b” and “c” are concurrent hours. However, in its petition before the trial court, the lessor set out the above figures and sought compensation for a total of 19,-689 hours of usage (the sum of “a” and “b”), either under the contract at $53 per hour or on a quantum meruit basis at the same rate.
 
 [3]
 
 The Government denied liability on the grounds that the overtime services were not “requested by, and furnished” within the meaning of the lease and that any overtime services provided were
 
 de minimis.
 
 At the close of the trial the Government added the defense that the claim was partially barred by the statute of limitations.
 

 
 *1363
 

 The Trial Court's Holding
 

 The Claims Court upheld the Government’s defense that the statute of limitations barred recovery of appellant’s claim for 16,059 hours of overtime usage which occurred more than six years prior to September 13, 1978, the date on which the petition was filed.
 
 [4]
 
 The court, however, held the Government not only liable for the balance of the claim asserted by appellant, 3,630 hours, basing these hours on Computer Room One category “b” above, but also increased the claim to include the 1,144 hours of usage of Computer Room Three set forth in “c.” Holding that S.A. 10, though it attempted to deal with all problems of overtime usage, left a gap with respect to Computer Room One, the trial judge ruled that recovery for these hours should be based on the lessor’s actual costs in providing these overtime services. With respect to Computer Room Three, the court held that the 1,144 hours of overtime usage were not concurrent with Computer Room One usage, that this additional usage fell under the specific provisions of S.A. 10, and that it was, therefore, compensable at the rate of $53 per hour.
 

 Both parties take exception to the trial judge’s “reformation” of the contract and, in addition, challenge the respective holdings against them.
 

 DISCUSSION
 

 I
 

 The initial question raised by the appeal is whether, as asserted by both parties, the overtime usage of Computer Room One falls within the scope of S.A. 10. Contrary to the trial judge’s holding, we agree with the parties that S.A. 10 applies.
 

 The trial judge was led to the conclusion that S.A. 10 did not encompass overtime usage of Computer Room One by inferences drawn from other provisions in the lease. Schedule “B," ¶4, relating solely to Computer Room One, obligated the lessor “[a]s part of the rental consideration,” to provide heat and air conditioning 24 hours a day “to maintain proper environmental conditions for the equipment.” In the trial judge’s view, application of S.A. 10 to Computer Room One would require additional payment for the heat and air conditioning required to be furnished at all times under ¶ 4. Accordingly, the trial judge found it unlikely “that S.A. 10 was drafted with the possibility of this double-counting in mind” or “that the government would knowingly endorse the application of
 
 any
 
 duplicative overtime charges” (emphasis by trial judge). We cannot adopt this rationale.
 

 Appellant argues that S.A. 10 was understood by the lessor to apply to Computer Room One and that the provisions of ¶ 4 relate solely to the equipment, not personnel. Moreover, the $53 per hour figure represents an average cost; if the lessor agreed to $53 for those hours when the building was fully staffed and running costs upwards of $100, then it follows that the Government must have likewise agreed to pay $53 per hour where the overtime usage could result in costs under $53 per hour. The parties do not dispute that this construction is reasonable in view of the broad language of S.A. 10. Indeed, the trial judge agreed that S.A. 10 could be so construed were it not for the duplicative effect which the court was hesitant to believe the Government would “knowingly endorse.” However, it is not the Government’s intent alone that could control here.
 

 First, we must consider that the lease and S.A. 10 were drafted by the Government and must be construed against the drafter.
 
 See, e.g., Peter Kiewit Sons’ Co. v. United States,
 
 109 Ct.Cl. 390, 418 (1947). Second, the Government does not dispute that the lessor’s interpretation is reasonable.
 
 See, e.g., Consolidated Diesel Electric Co. v. United States,
 
 533 F.2d 556, 574-75 (Ct.Cl.1976), and cases cited. Third, as aptly stated by Judge Learned Hand:
 

 
 *1364
 
 A contract has, strictly speaking, nothing to do with the personal, or individual intent, of the parties. A contract is an obligation attached by the mere force of law to certain acts of the parties, usually words, which ordinarily accompany and represent a known intent. If, however, it were proved by twenty bishops that either party, when he used the words, intended something else than the usual meaning which the law imposes upon them, he would still be held, unless there were some mutual mistake or something else of the sort. Of course, if it appear by other words, or acts, of the parties, that they attribute a peculiar meaning to such words as they use in the contract, that meaning will prevail, but only by virtue of the other words, and not because of their unexpressed intent.
 

 Hotchkiss v. National City Bank of New York,
 
 200 F. 287, 293 (S.D.N.Y.1911),
 
 aff’d,
 
 201 F. 664 (2d Cir.1912),
 
 aff’d,
 
 231 U.S. 50, 34 S.Ct. 20, 58 L.Ed. 115 (1913). Thus, courts have required that one contesting the reasonable construction given particular contract language show either that
 
 both
 
 parties understood the language to mean one thing which is not in accord with that construction or, at least, that the proponent of that view had no reason to know of such reasonable construction at the time of making the agreement.
 
 Compare V’Soske v. Barwick,
 
 404 F.2d 495 (2d Cir.1968),
 
 cert. denied,
 
 394 U.S. 921, 89 S.Ct. 1197, 22 L.Ed.2d 454 (1969).
 

 In line with the above principles the court would have erred in adopting the view that Computer Room One was not covered by S.A. 10, had this position been urged by one of the parties. In view of the mutuality of interpretation by the lessor and the lessee,
 
 [5]
 
 albeit not in the effect of S.A. 10 but in its providing the framework for resolution of this dispute, we see no basis to hold that it does not apply. Accordingly, we turn to the question of its interpretation.
 

 II
 

 Accepting that S.A. 10 applies to Computer Room One, the Government puts forth an interpretation of that agreement that would preclude liability. The Government premises its position on that part of S.A. 10 which reads:
 

 Overtime Services:
 
 Heat, air conditioning, elevator services, and electricity for all purposes and all other services set forth in Schedule "B” paragraph 2(a) shall be provided by the Lessor at other time outside the work hours specified above in Paragraph 2 of this Schedule “B”, Maintenance and Service Provisions, upon four (4) hours’ advance written notice from the Government. No charge shall be made for the first 50 hours of such overtime requested by, and furnished to, the Government during each lease year. The Government will pay for overtime services
 
 requested by,
 
 and furnished to, the Government ... at the rate of $53.00 per hour irrespective of the numbers of floors or portions worked or the number of hours worked.
 
 The Lessor shall not be entitled to any other payment
 
 for said overtime services
 
 and shall not make any other claim therefor.
 
 [Emphasis added.]
 

 Although the lessor “furnished” overtime services, the Government contends that there is no liability because the services were not “requested” within the meaning of the above paragraph. Moreover, it adds that the final above-quoted sentence means that the lessor can make no claim for the “unrequested” overtime services in issue. This argument is not as simplistic as it may first appear.
 

 The Government argues that, under the original lease, compensable overtime services were restricted to those whose costs increased in direct consequence of extra hours of building use,
 
 i.e.,
 
 heat and air conditioning; that other services related to extra-hours building use were not intended
 
 *1365
 
 to be compensable, assuming they were not substantially in excess of normal usage; and that this theory of compensability was intended to be carried forward into subsequent amendments. To effectuate this intent, the Government argues, the parties agreed to the limitation that no charge could be made for overtime unless “requested.” If no request was properly made, the lessor had no obligation to allow use of the building facilities, i.e., lavatories, lobby, elevators, lights in hallways, and the like, the usage for which it now seeks payment.
 

 We do not find this interpretation to be reasonable for a number of reasons. First, S.A. 10 expressly broadened the scope of what was deemed overtime services to include all services set forth as obligatory building services in Schedule “B,” ¶ 2, that is, services such as lavatories. Heating and air conditioning were no longer the essential criteria of compensable overtime. Second, the Government places undue reliance on the words “requested by.” We cannot agree that the Government may use that provision as a shield to deny liability for services that it not only received, but actually desired. Indeed, the reasonable construction of that provision is (a) to protect the Government from frivolous claims,
 
 e.g.,
 
 a single employee staying a few minutes late, or claims for services rendered that it did not want, and (b) to protect the lessor from facing liability for breach of contract for failure to provide services without the requisite notice. Neither purpose is served by the Government’s position here and we decline to accept it.
 

 In any event, because the heat and air conditioning were to be available in Computer Room One 24 hours a day, and any increased need caused by the presence of employees would, therefore, be provided “on demand” and most of the remaining services were, by their nature, also “on demand” throughout the building, a formal request was not necessary, as a practical matter, to receive those services. Accordingly, we see the deliberate use of those services under the circumstances here as, at least, a constructive request.
 

 Finally, the plain meaning of the last sentence is that the lessor is entitled to $53 per hour for overtime services in the quoted paragraph, no more, no less, irrespective of the actual cost of providing such services. This meaning is reinforced, given that the $53 per hour figure is an average cost, as discussed earlier.
 

 Since we hold that the overtime usage of Computer Room One is covered by the lease, it follows that the rate to be applied is $53 per hour.
 

 Ill
 

 With respect to whether appellant may recover for the entirety of its claim, we further conclude that no part is barred by the statute of limitations as having “accrued” more than six years before this suit was filed.
 

 As a general rule, a claim accrues when all events necessary to fix the Government’s liability have occurred,
 
 e.g.,
 
 the services have been rendered, thus entitling the contractor to demand payment.
 
 Nager Electric Co. v. United States,
 
 368 F.2d 847, 851, 177 Ct.Cl. 234 (1966). However, “a particular agreement ... can establish some other pre-condition for liability or an unusual time for demanding payment.”
 
 Id.
 
 at 852.
 

 The lessor correctly contends that the reporting and billing practices for overtime use adopted with S.A. 10 are controlling and that the Government’s liability was not fixed until the overtime use had first been reported to the lessor. The reporting and billing practice adopted here was precisely that followed in
 
 Manufacturer’s Aircraft Association v. United States,
 
 77 Ct.Cl. 481, 17 USPQ 439,
 
 cert. denied,
 
 291 U.S. 667, 54 S.Ct. 442, 78 L.Ed. 1057 (1934). There it was held that the timeliness of plaintiff’s .suit for the recovery of unpaid royalties was to be measured from the date that the Government first formally reported its use of plaintiff’s patents and not from the date that the use had occurred or from the date that the report was otherwise due.
 

 
 *1366
 
 The Government argues that the reporting was irrelevant because the claim must be taken as having accrued when the services were performed unless the Government’s use of the overtime services was “inherently unknowable” to the lessor citing
 
 Japanese War Notes Claimants Association v. United States,
 
 373 F.2d 356, 178 Ct.Cl. 630,
 
 cert. denied,
 
 389 U.S. 971, 88 S.Ct. 466, 19 L.Ed.2d 461 (1967). The Government fails to recognize that the “inherently unknowable” doctrine stands for no more than that the “statute will not begin to run until [the lessor] learns or reasonably should have learned of his cause of action.”
 
 Id.
 
 at 359.
 

 There is no question but that the lessor first actually learned of the use in 1974, well within the limitation period. Moreover, the Government, by taking control of after-hours access to the building and, additionally, taking upon itself the obligation to report overtime usage, relieved the lessor of the costly burden of monitoring such usage, thereby leading to the lower agreed charge. We see no basis for holding that it would have been reasonable for the lessor to have discovered the use at an earlier date under these circumstances.
 

 IV
 

 The final issue raised by this appeal is whether additional compensation must be paid for 1,144 overtime hours delineated in S.A. 22 for Computer Room Three. We conclude that the holding by the trial judge that these hours are separately compensable was error. The hours of usage of Computer Room Three provide an
 
 alternative
 
 basis for compensation for 1,144 hours of the total claim.
 

 Computer Room Three was not in existence at the inception of the lease, but rather was built at a later date by the Government under its right to alter the premises. The trial judge correctly found that Computer Room Three was covered by S.A. 10, the same as any other portion of a floor. In other words, it was treated the same as the space from which it was created. Thus, the basis for allowance of this claim was different, in the court’s view, from the claim for Computer Room One.
 

 This dichotomy has been present throughout these proceedings. The claim for Computer Room Three did not necessarily stand or fall with that for Computer Room One. Thus, appellant has repeatedly asserted alternative theories for recovery of 1,144 of the total 19,689 hours, some based on Computer Room One, some based on Computer Room Three, but has never asserted, indeed, has denied, that the hours were separately recoverable.
 

 The transcript of a prehearing conference with Administrative Judge Williams of the GSBCA discloses the following dialogue:
 

 Judge Williams: But your point now is that the overtime that might have occurred with respect with this other room [Computer Room Three] was also overtime which was being experienced in Room No. 1
 

 Mr. Tenerowicz: )
 

 )
 

 Mr. Walzer: ) Yes (in unison)
 

 )
 

 Mr. Israel: )
 

 Judge Williams: OK, so you are only going to charge once.
 

 Mr. Walzer: We are only going to be paid once, but we may have a different legal theory as it develops on that smaller area.
 

 In Unison: That is correct.
 

 Not only did appellant fail to assert a claim for these hours
 
 in addition to
 
 overtime hours in Computer Room One in its petition, but also the parties specifically agreed that Computer Room Three hours were, or would be treated, as
 
 concurrent
 
 with the hours claimed for Computer Room One.
 

 Not unexpectedly, appellant has embraced in this appeal the rationale of the trial judge leading to his conclusion that S.A. 22 can be construed to provide an independent claim for Computer Room Three. Regardless of the merits of this analysis, the issue was not before the court for decision. The subsequent stipulation of the parties controls.
 

 
 *1367
 
 In view of the foregoing, the judgment of the Claims Court is modified and the case is remanded to the Claims Court for further proceedings in accordance herewith.
 

 MODIFIED and REMANDED.
 

 [1]
 

 . Pursuant to order of this court dated October 4, 1982, Judge Wiese, on October 8, 1982, entered a final judgment in accordance with the recommended decision of September 25, 1981. We treat the parties’ exceptions to that decision as cross-appeals from the final judgment.
 

 [2]
 

 . 28 U.S.C. § 2501 provided:
 

 Every claim of which the Court of Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues.
 

 This statute was amended by § 139(a) of the Federal Courts Improvement Act of 1982, Pub.L. No. 97-164, 96 Stat. 25, 42, and now applies to the United States Claims Court.
 

 [3]
 

 . Originally, the lessor asserted $106 per hour as the basis for a quantum meruit award. This has been modified to $53 per hour during these proceedings.
 

 [4]
 

 . Coincidentally, the trial court’s holding would bar recovery of the hours set forth in part “a” quoted from S.A. 22, supra. The two categories resulted, originally, from a delay in making the compilation for the pre-September 1972 period, not from considerations of the statute of limitations.
 

 [5]
 

 . The Government urges, for example, that to adopt the trial judge’s position resulting in a compensation for actual costs would be error if for no other reason than that the parties would then be placed “right back in the problem they sought to escape by S.A. 10." Moreover, both parties assert that they would not have agreed to the terms the trial judge inserted.