**Elmer N. CAMPBELL and Marie
L. Campbell**

v.

**The UNITED STATES.**

No. 425–86C.

United States Claims Court.

April 28, 1989.

Martin W. Hable, North Branch, Mich., atty. of record, for plaintiff.

Terrence S. Hartman, Washington, D.C., with whom was Asst. Atty. Gen. John R. Bolton, for defendant.

## OPINION

YOCK, Judge.

This contract case is currently before the Court on the defendant's motion for summary judgment. Since it is concluded that this Court lacks jurisdiction over the plaintiffs' claims herein, the defendant's motion is granted and the plaintiffs' complaint is to be dismissed. Having decided that this Court does not have jurisdiction over the plaintiffs' claims herein, the defendant's counterclaim must also be dismissed.

## FACTUAL BACKGROUND

In the early 1970's, the plaintiffs, Elmer and Marie Campbell, were engaged in the operation of a family dairy farm located near Yale in St. Clair County, Michigan. To facilitate the expansion of their dairy farm business, the plaintiffs, in November, 1973, applied for and received two loans from the Farmers Home Administration (FmHA). The FmHA is an agency within the United States Department of Agriculture, which provides credit for those in rural America who are unable to get credit from other sources at reasonable rates and terms. FmHA operates principally under the Consolidated Farm and Rural Development Act (7 U.S.C. § 1921) and title V of the Housing Act of 1949 (42 U.S.C. § 1471 et seq.).

On November 8, 1973, the plaintiffs received the sum of $50,000 as an operating loan (OL) and, in exchange, executed the appropriate promissory note (6¾ percent annual interest to be paid up in seven years) and security agreement for chattels and crops in favor of the United States Government. On November 9, 1973, the plaintiffs received the sum of $85,000 as a farm ownership loan (FO) and, in exchange, executed the appropriate promissory note (5 percent annual interest to be paid up in 40 years) and a real estate mortgage in favor of the United States.

Both promissory notes contained a standard default (and acceleration) clause as well as what can be called a regulation incorporation clause. The OL promissory note stated:

**DEFAULT** hereunder shall constitute default under any other instrument evidencing a debt of Borrower owing to or insured by the Government or securing or otherwise relating to such a debt; and default under any such other instrument shall constitute default hereunder. **UPON ANY SUCH DEFAULT,** the Government at its option may declare all

or any part of any such indebtedness immediately due and payable.

This note evidences a loan to Borrower made or insured by the Government pursuant to the Consolidated Farmers Home Administration Act of 1961. This note shall be subject to the present regulations of the Farmers Home Administration and to its future regulations not inconsistent with the express provisions hereof.

Likewise the FO promissory note stated:

**DEFAULT:** Failure to pay when due any debt evidenced hereby or perform any covenant or agreement hereunder shall constitute default under any other instrument evidencing a debt of Borrower owing to or insured by the Government or securing or otherwise relating to such a debt; and default under any such other instrument shall constitute default hereunder. **UPON ANY SUCH DEFAULT,** the Government at its option may declare all or any part of any such indebtedness immediately due and payable.

This note is given as evidence of a loan to Borrower made or insured by the Government pursuant to the Consolidated Farmers Home Administration Act of 1961 if the box opposite "FO", "FONFE", "RL", or "SW(Ind.)", is checked under the heading "KIND OF LOAN" or pursuant to Title V of the Housing Act of 1949 if the box opposite "RH", "RRH", or "LH", is checked. This note shall be subject to the present regulations of the Farmers Home Administration and to its future regulations not inconsistent with the express provisions hereof.

In addition, the OL Security Agreement (Chattels and Crops) had a similar default clause allowing the Government to foreclose and a similar regulation incorporation clause.

Also, the OL security agreement included what can be called a future advances clause. This clause stated:

J. Secured Party will make or insure future loans or advances to Debtor to enable him to raise or harvest farm crops or raise livestock or other animals, provided funds are available and the Debtor meets all then current requirements imposed by regulations of the Secured Party.

Likewise, the real estate mortgage securing the FO loan contained similar regulation incorporation and default clauses. The default clauses provided in part as follows:

(17) SHOULD DEFAULT occur in the performance or discharge of any obligation secured by this instrument, or should any one of the parties named as Borrower die or be declared an incompetent, a bankrupt, or an insolvent, or make an assignment for the benefit of creditors, the Government, at its option, with or without notice, may: (a) declare the entire amount unpaid under the note and any indebtedness to the Government hereby secured immediately due and payable, * * * (d) *foreclose this instrument as provided herein or by law* [.] [Emphasis added.]

and

(23) At the option of the Government this mortgage may be foreclosed by action, or by advertisement as provided by statute or rules of practice relating thereto, and Borrower hereby irrevocably vests in the Government the statutory power of sale and constitutes and appoints the Government his agent and attorney in fact to sell the property, after due notice, at public auction to the highest bidder, for cash or secured credit at the option of the Government, and to give the purchaser a warranty deed binding upon Borrower and all claiming under him.

All of the above discussed clauses are important for a proper consideration of the claims made in this case.

In 1974, plaintiffs began to experience some difficulties in the operation of their dairy farm. Apparently, in the summer and fall of 1974, plaintiffs suffered a severe crop failure due to an unusual drought condition which resulted in a shortage of feed necessary for the maintenance and welfare of their dairy herd. Consequently, in late 1974 or early 1975, plain-

tiffs initiated an attempt to secure additional loan funds from the FmHA to purchase the necessary feed supplies for their dairy herd. The circumstances surrounding the negotiations involved with this process are disputed. However, it is clear that on April 2, 1975, the FmHA denied the plaintiffs' request for an FmHA emergency loan (EM) in the amount of $6,000.

Plaintiffs contend that critical to the FmHA's decision not to grant the emergency loan was a "Farm and Home Plan" (FHP) dated March 27, 1975. An FHP is a type of financial analysis which must be completed as a prerequisite to gaining loan approval from the FmHA. The FHP noted above stated that plaintiffs had a *negative* net worth of $19,471 as of March, 1975. However, plaintiffs argue that the March FHP was inaccurate in that it misstated some important figures as well as being fraudulent because the FHP bore no signature (especially their own). Moreover, plaintiffs state that an FHP dated January 8, 1975—which plaintiffs did sign—showed plaintiffs' net worth to have been some $83,555. The plaintiffs did not discover the March, 1975 FHP until sometime in 1985.

In any event, shortly after the FmHA's denial of the plaintiffs' application for an emergency loan (EM) on April 2, 1975, the plaintiffs sold their dairy herd, since they had no further funds to purchase feed. The proceeds were applied to the balance owed to the FmHA on the chattel mortgage (security agreement). During the rest of 1975, the plaintiffs continued to sell off the personal property securing their FmHA loans while applying the proceeds of such sales to the sum owed to the FmHA. Thereafter, they continued to reside on the farm (real estate) while making repeated efforts to sell the farm in order to pay off the entire FmHA indebtedness. On April 17, 1978, the plaintiffs were successful in selling 40 acres of their farm for some $40,000, which sum was likewise applied to the plaintiffs' indebtedness to the FmHA.

Finally, on April 18, 1980, the FmHA mailed the plaintiffs a notice of acceleration thereby demanding payment in full of the November 9, 1973 promissory note (which was secured by the plaintiffs' real estate mortgage) within thirty (30) days. This notice was issued as a result of plaintiffs' monetary default on their farm ownership loan. Subsequent to issuing the notice of acceleration, the FmHA arranged by letter dated May 13, 1980, for the publication of a foreclosure sale notice in a local newspaper. Such notice was also forwarded to the plaintiffs. Thereafter, on July 11, 1980, the plaintiffs' remaining farm real estate was sold at a nonjudicial mortgage foreclosure sale. FmHA submitted the successful bid of $110,000 at this sale thereby taking possession and ownership. Ultimately, the real estate was transferred from the FmHA to a Ms. Charlene Iseler on February 22, 1984, by way of quit claim deed.

On July 2, 1986, the plaintiffs filed a complaint in this Court based upon the above-mentioned factual circumstances. The plaintiffs' complaint alleges that FmHA officials: (1) violated the plaintiffs' fifth amendment due process rights in that the Government failed to provide managerial assistance and loan deferral relief as required by regulations; (2) violated the plaintiffs' first amendment rights in that the FmHA responded to the plaintiffs' expressions of grievances and help by retaliating against them through instituting foreclosure proceedings; (3) used abusive treatment towards the plaintiffs by actions that were oppressive, arbitrary, and grossly negligent; and (4) breached the contract the plaintiffs had with the FmHA in that the FmHA official refused to grant the plaintiffs further loans when needed and violated the contractual and fiduciary duties of fair dealing. In the complaint's prayer for relief, the plaintiffs request a declaratory judgment and compensatory damages in the amount of some $1,787,421. On November 12, 1986, the defendant filed its answer and counterclaim in this case. Thereafter, the defendant filed its current motion for summary judgment.[1]

1. Although oral argument was initially requested by the plaintiffs, neither party now believes a

## DISCUSSION

■ In its motion for summary judgment, the defendant has basically argued that this Court does not have jurisdiction over any of the plaintiffs' claims as alleged. To begin with, the defendant points out that the plaintiffs' claims of abusive treatment that stem from the FmHA's alleged misconduct and failures to provide managerial information necessary for the proper operation of the plaintiffs' farm sound essentially in tort, and thus are expressly beyond the jurisdiction of the Court. *See* 28 U.S.C. § 1491(a)(1) (1982); *see also Aetna Casualty & Surety Co. v. United States,* 228 Ct.Cl. 146, 164, 655 F.2d 1047, 1059 (1981); *Somali Development Bank v. United States,* 205 Ct.Cl. 741, 748–49, 508 F.2d 817, 821 (1974). This Court agrees with the defendant on this point. The Court does not have jurisdiction over the plaintiffs' claims that allege abusive treatment by the FmHA officials. *See Smithson v. United States,* 847 F.2d 791, 794 (Fed.Cir.1988).

■ Next, the defendant argues that this Court does not have jurisdiction over the plaintiffs' claims which allege violations of their first amendment and fifth amendment due process rights, because neither of these constitutional claims mandate any money judgment for their violation. Again, the defendant is correct. *See United States v. Connolly,* 716 F.2d 882, 887–88 (Fed.Cir.1983) (*en banc*), *cert. denied,* 465 U.S. 1065, 104 S.Ct. 1414, 79 L.Ed.2d 740 (1984) (first amendment jurisdiction issue); *Inupiat Community v. United States,* 230 Ct.Cl. 647, 662, 680 F.2d 122, 132, *cert. denied,* 459 U.S. 969, 103 S.Ct. 299, 74 L.Ed.2d 281 (1982) (fifth amendment due process jurisdiction issue).

Finally, the defendant argues that, although this Court does have jurisdiction to entertain claims based on alleged breaches of contract by the Government or violation of regulations that mandate the payment of money damages, the plaintiffs' claims in this case based on contract or regulations are either jurisdictionally barred by the statute of limitations or for other reasons have jurisdictional impediments that block their consideration by this Court. The defendant contends that except for the future loans or advances clause, the plaintiff has not identified any express contractual clause which will support a breach of contract claim.[2] Although the plaintiffs advance the FmHA regulations as being a basis for their breach of contract claim, defendant argues that a boiler-plate incorporation clause did not incorporate FmHA's mass of regulations wholesale into the relevant contracts. As for the claim premised on the future loans or advances clause itself, defendant asserts that the six-year statute of limitations bars consideration of such claim by this Court. Essentially, the defendant contends that the statute began to run on April 2, 1975, when plaintiffs' emergency loan application was denied, and therefore the limitations' period expired prior to the filing of plaintiffs' claim before this Court on July 2, 1986. In addition, the defendant argues that relevant FmHA reg-

---

hearing is necessary. The Court concurs with this view since the parties have had ample opportunity to argue their respective positions in their written presentations.

2. In addition to the arguments premised upon their express contract with the FmHA, plaintiffs assert an entitlement to recovery on the basis of an implied-in-fact contract. Specifically the plaintiffs contend that the FmHA agreed not to accelerate their loans when an honest dispute existed and further that the FmHA agreed to provide the necessary professional and financial advice to keep their farming business viable. In this regard, an implied-in-fact contract must be founded upon the same contractual elements as are required for an express contract. *See ATL, Inc. v. United States,* 4 Cl.Ct. 672, 675, *aff'd,* 735 F.2d 1343 (Fed.Cir.1984). Unfortunately, however, the plaintiffs have not alleged these elements which are necessary to establish an implied-in-fact contract, nor have they identified any conduct by the Government which would indicate assent to the alleged agreement. Moreover, the plaintiffs have also failed to identify any official who allegedly bound the Government to this agreement much less discuss his authority to do so. Mere unsupported allegations and general conclusion are insufficient to withstand a summary judgment motion. *See Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1390–91 (Fed.Cir.1987). Consequently, this Court finds that the plaintiffs have failed to establish a claim premised on an implied-in-fact contract for which relief can be granted.

ulations are not "money-mandating" as required by the Tucker Act, 28 U.S.C. § 1491 (1982), as well as case law interpreting the Tucker Act and consequently form no independent basis for plaintiffs' claim in this case.[3]

Although the defendant's arguments pertaining to the plaintiffs' contractual and regulatory claims require some discussion herein, the Court also agrees with the defendant on these points. The contract and regulatory claims as alleged herein do not grant this Court jurisdiction over this action.

■ The first issue that must be dealt with is the plaintiffs' contention that the FmHA regulations that deal with the loan programs at issue here (FO, OL, EM) are money-mandating and thus form an independent basis for jurisdiction in this Court when the Government violates these regulations. It is, of course, quite true that a substantive right to monetary compensation must exist under such regulations before jurisdiction may be established in this Court by virtue of the Tucker Act, 28 U.S.C. § 1491 (1982). *See United States v. Mitchell*, 463 U.S. 206, 216–17, 103 S.Ct. 2961, 2967–68, 77 L.Ed.2d 580 (1983) (*Mitchell II*); *Connolly, supra*, 716 F.2d at 885; *see also United States v. King*, 395 U.S. 1, 3, 89 S.Ct. 1501, 1502, 23 L.Ed.2d 52 (1969) (Court of Claims' jurisdiction limited to claims for money damages against United States Government); *Eastport Steamship Corp. v. United States*, 178 Ct.Cl. 599, 605–06, 372 F.2d 1002, 1007 (1967) (violation of licensing regulations found not to imply a right to money damages). Unfor-

tunately for the plaintiffs, several recent cases have addressed the plaintiffs' contention in this regard and have subsequently refused to adopt it.[4]

In *Hanson v. United States*, 13 Cl.Ct. 519, 526–28 (1987), *aff'd*, 861 F.2d 728 (Fed. Cir.1988) (unpublished), the Court found that the FmHA regulations pertaining to the emergency loan program were simply not money-mandating regulations that gave jurisdiction to this Court for the alleged violations thereof. Relying on *Mitchell II, supra*, 463 U.S. at 218, 103 S.Ct. at 2968, for guidance, the Court concluded that the underlying purpose of the emergency loan regulations—promulgated at 7 C.F.R. §§ 1945.01–.200 (1986)—was "to make 'adequate financial assistance available' to eligible applicants" and such purpose simply was not furthered by the recognition of a damages remedy. *Hanson, supra*, 13 Cl.Ct. at 528. Consequently, no right to money damages exists under the implementing regulations for the emergency loan program and thus this Court has no jurisdiction to hear such claims. *Id.*

Also, in *Hansen v. United States*, No. 193–86C (Cl.Ct. July 8, 1987) (unpublished), *aff'd on other grounds*, 848 F.2d 1245 (Fed.Cir.1988) (unpublished), Judge Lydon decided the issue and, after considerable anguish, concluded that the FmHA loan regulations were in fact money-mandating and did grant this Court jurisdiction.[5] However, the Court went on to find against the plaintiffs on the merits of its argument. It was Judge Lydon's merits decision that was thereafter affirmed by the Federal Circuit after the Circuit first expressed consid-

---

**3.** Although it is unclear the extent to which the plaintiffs are alleging a taking in this case, this Court cannot credit any such claim as being seriously espoused in view of the facts as alleged herein. Since the loan agreement is the basis for the plaintiffs' claim, any violation thereof would give rise, at best, to a breach of contract claim, not a taking claim under the circumstances of this case. *See Sun Oil Co. v. United States*, 215 Ct.Cl. 716, 768–72, 572 F.2d 786, 817–19 (1978).

**4.** The Court also rejects plaintiffs' breach of trust argument premised on *United States v. Mitchell*, 463 U.S. 206, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983). The relationship created between a

borrower and the FmHA is one of debtor-creditor not beneficiary-trustee. The situation in the instant case, involving non-Indian plaintiffs, is simply in no way relevant to or controlled by *United States v. Mitchell, supra*, which was concerned with dealings between the Government and the Indian people where there is an "undisputed existence of a general trust relationship * * *." *Id.* at 225, 103 S.Ct. at 2972.

**5.** Although the *Hansen* case was unpublished, both parties had received copies of that case (trial and appellate decision) and had the opportunity to argue the case in their briefings to the Court.

erable doubt that the regulations discussed by the Claims Court were money-mandating in the sense of *Eastport Steamship Corp., supra,* 178 Ct.Cl. at 605–06, 372 F.2d at 1007. It is very clear that had the Federal Circuit been required to decide the issue, it would have decided the issue adversely to the plaintiffs' current position as it did later in affirming Judge Gibson in *Hanson v. United States, supra.*

In support of their argument, the plaintiffs point to several regulations which they believe are examples of money-mandating regulations. Initially, the plaintiffs cite to two regulations relevant to the administration of OL loans—7 C.F.R. §§ 1941.2 and 1941.3 (1986).[6] Section 1941.2 simply offers a broad policy statement as to what the underlying objective of the OL loan program is. *See* 7 C.F.R. § 1941.2 (1986) ("The basic *objective* of the OL loan program is to provide the credit and management assistance necessary for farmers, ranchers and rural youth to conduct successful operations"). Likewise, section 1941.3 is also a broad statement which provides for management assistance to qualified borrowers so as to insure the achievement of the OL loan program objectives. *See* 7 C.F.R. § 1941.3 (1986) (*"management assistance* will be provided all borrowers to the extent necessary to achieve the *objectives* of the loans"). As in *Hanson, supra,* regulations providing necessary credit and management assistance for farmers simply would not be furthered by the recognition of a damages remedy in favor of plaintiffs. This conclusion is consistent with *Mitchell II, supra,* which requires this Court to examine the purposes of and duties created by a regulatory scheme when attempting to determine if the regulations may be fairly interpreted as mandating compensation. *See Mitchell II, supra,* 463 U.S. at 217, 103 S.Ct. at 2968. Therefore, the OL loan program regulations cited by plaintiffs cannot be relied upon to establish jurisdiction before this Court.

Other regulations cited by the plaintiffs are two FO loan regulations—7 C.F.R. §§ 1943.2 and 1943.3 (1986)—which aid in the administration of such loans. Again, these regulations simply state the broad policy objectives of the FO loan program and provide a means for achieving such objectives. *See* 7 C.F.R. § 1943.2 (1986) ("The basic *objectives* * * * in making FO loans are to assist eligible applicants to become owner-operators of family farms, to make efficient use of land, labor and other resources, to carry on sound and successful operations on the farm, and to enable farm families to have a reasonable standard of living."); 7 C.F.R. § 1943.3 (1986) ("Supervision will be provided borrowers to the extent necessary to achieve the objectives of the loan and *to protect the interests of the Government* * * *.") (Emphasis added.) Therefore, FO loan regulations, like their counterparts in the EM and OL loan programs, cannot be fairly interpreted as mandating compensation. Instead, the emphasis is placed on protecting the Government's interest in providing a successful loan program as opposed to protecting the individual interests of farmers.

Finally, plaintiffs cite two regulations which address the administration of FmHA loans after such loans have been granted. *See* 7 C.F.R. § 1951.33(b) (1986) (guidelines relevant to consolidation, rescheduling and deferral of loan payments); 7 C.F.R. § 1951.33(c)(4) (1986) (guidelines to be used in establishing repayment schedules for consolidated and rescheduled FmHA loans). Clearly, these regulations are not money-mandating since they are obviously intended to protect the Government's interests once a farmer experiences difficulty in meeting repayment obligations.

The FmHA regulations at issue here simply cannot be considered to be money-mandating regulations by any stretch of the Court's imagination. Thus, for the reasons stated above, plaintiffs have failed to state a claim based upon cited FmHA regula-

---

**6.** All FmHA regulations cited refer to those regulations in place for 1986. However, the essence of the cited regulations have remained substantially similar in language and scope for all pertinent years at issue herein.

tions which may be sustained within the jurisdiction of this Court.

■ The second issue that must be addressed is the plaintiffs' incorporation position. Even though the FmHA regulations are not money-mandating in the sense necessary to establish jurisdiction before this Court, plaintiffs still attempt to rely upon such regulations as a basis for their cause of action. In this regard, plaintiffs contend that all FmHA regulations were incorporated into their contract with FmHA by virtue of an incorporation clause found in the real estate mortgage and chattel security agreement executed by the parties, and therefore such regulations serve as a basis for their breach of contract claim. The incorporation clause reads as follows:

This instrument shall be subject to the present regulations of the Farmers Home Administration, and to its future regulations not inconsistent with the express provisions hereof.

The exact issue posed by plaintiffs was addressed recently by the United States Court of Appeals for the Federal Circuit.[7] In *Smithson v. United States, supra,* the Federal Circuit stated the issue as follows: "Were the FmHA regulations incorporated into the appellants' contract with the agency so that the Government's alleged breach of those regulations constituted a breach of contract?" *Smithson, supra,* 847 F.2d at 794. After analyzing the relevant incorporation clause, the Court concluded that "the agency's regulations [did not form] an integral part of the [plaintiffs'] contract with FmHA and that violation of any of those regulations [could not] serve as a proper basis for the complainants' claims of breach of contract." *Id.* at 795. Consequently, as in *Smithson,* the plaintiffs herein may not rely on FmHA regulations to establish a breach of contract claim before this Court. Thus, again, as to this second issue, the plaintiffs have failed to state a claim within the jurisdiction of this Court.

■ The final issue to be decided herein is whether a future loans or advances clause contained within the parties' contract documents gives the plaintiffs a sustainable cause of action in this Court. As noted earlier, the chattel security agreement executed by the parties in conjunction with the awarding of the November, 1973 loans contained a future loans or advances clause. It reads:

Secured Party [FmHA] *will* make or insure future loans or advances to Debtor to enable him to raise or harvest farm crops or raise livestock or other animals, *provided* funds are available and the Debtor meets all then current requirements imposed by regulations of the Secured Party [ (FmHA]. (Emphasis added.)

A reasonable interpretation of this clause clearly places an obligation upon the FmHA to entertain loan requests by plaintiffs which are made subsequent to the granting of an initial loan. However, such obligation is conditional (as opposed to absolute) upon the availability of funds and the presence of a qualified debtor. In any event, this clause provides an adequate basis for plaintiffs to formulate a contractual claim capable of being presented before this Court. *See Nutt v. United States,* 12 Cl.Ct. 345, 354 (1987), *aff'd sub nom., Smithson v. United States,* 847 F.2d 791 (Fed.Cir.1988).

Since the future loans or advances clause can support a contractual claim under the proper circumstances, it is incumbent upon the plaintiffs to define actions on behalf of the FmHA which may be deemed to be a violation of such clause. In this connection, it is undisputed that the FmHA did in fact deny, on April 2, 1975, a loan application presented by the plaintiffs.[8] Therefore, the plaintiffs contend that such denial was a direct violation of the future loans or advances clause.

■ Although the issue raised by plaintiffs qualifies as being genuine and materi-

---

7. The incorporation clause at issue herein is essentially identical to the one analyzed by the Federal Circuit.

8. Plaintiffs fail to identify any other FmHA act which may be deemed to be a violation of the future loans or advances clause.

al so as to defeat the defendant's motion for summary judgment, this Court need not address the merits of such issue because its assertion is barred by the applicable statute of limitations. Section 2501 of title 28 of the United States Code provides that:

> Every claim of which the United States Claims Court has jurisdiction shall be barred unless the petition thereon is filed within six years after each claim first accrues.

In this regard, the defendant argues that the statute began to run on April 2, 1975, when plaintiffs' emergency loan application was denied and therefore the limitations' period expired prior to the filing of plaintiffs' claim before this Court on July 2, 1986.

In opposition to defendant's argument regarding the statute of limitations, plaintiffs' assert essentially three arguments. First, the plaintiffs contend that due to their continued indebtedness to FmHA, the statute of limitations has been tolled. Second, plaintiffs suggest that the concealment of an allegedly false/fraudulent FHP until the spring of 1985 likewise tolled the relevant statute of limitations. Finally, plaintiffs argue that the statute of limitations did not begin to run until July 11, 1980, the date of the public foreclosure sale at which time the plaintiffs' property was sold.

Unless plaintiffs' claim under the future loans or advances clause is found to have accrued within six years of the filing of their complaint, such claim is barred by the statute of limitations and must be dismissed for lack of jurisdiction. As a general rule, a claim against the Government is said to accrue when "all events necessary to fix the Government's liability have occurred." *L.S.S. Leasing Corp. v. United States*, 695 F.2d 1359, 1365 (Fed.Cir.1982); *see also Sellick v. United States*, 222 Ct.Cl. 679, 680 (1980). It is clear in the present case that the Government's potential liability was fixed, if at all, on April 2, 1975. It was on this date that FmHA denied plaintiffs' request for an additional loan. Consequently, it was at this point that the FmHA had theoretically violated their

agreement to award future loans or advances under the appropriate circumstances. Nothing more, other than a development of the evidence, was required for plaintiffs to advance a breach of contract action. Moreover, plaintiffs cannot argue that they were not "on inquiry" as to this potential claim because they concede that their request for a third loan was denied by FmHA on April 2, 1975. *See Welcker v. United States*, 752 F.2d 1577, 1580 (Fed. Cir.1985) (six-year statute commences running when plaintiff is aware of potential claim).

■ The plaintiffs' argument that their continuing indebtedness to FmHA tolled the statute of limitations is meritless. The statute of limitations within which one may initiate an action constitutes a limited waiver of sovereign immunity and therefore must be strictly construed. *See Soriano v. United States*, 352 U.S. 270, 273–74, 77 S.Ct. 269, 272, 1 L.Ed.2d 306 (1957). Under the plaintiffs' theory, as long as they owed money to the United States on the loan contracts, they could initiate suit against the United States at any time. Obviously, such a theory is inconsistent with the strict construction of the six-year limitation period.

■ On the other hand, the plaintiffs' assertion that the statute of limitations was tolled by the concealment of an allegedly false/fraudulent FHP merits some careful thought. In *Japanese War Notes Claimants Ass'n v. United States*, 178 Ct.Cl. 630, 634, 373 F.2d 356, 358–59 (1967), *cert. denied*, 390 U.S. 975, 88 S.Ct. 1020, 19 L.Ed.2d 1192 (1968), the United States Court of Claims noted the following:

> In certain instances the running of the statute will be suspended when an accrual date has been ascertained, but plaintiff does not know of his claim. Ignorance of rights which should be known is not enough. [Citations omitted.]

In this regard, before such a suspension may be invoked, the burden is on the plaintiffs to demonstrate: (1) "that defendant has concealed its acts" so that "plaintiff[s] [were] unaware" of their cause of action; or (2) "that its injury was 'inherently un-

knowable' at the accrual date." *Japanese War Notes, supra,* 178 Ct.Cl. at 634, 373 F.2d at 358–59.

As to the first exception, the plaintiffs clearly were aware, in April, 1975, that action adverse to them had been taken upon grounds which they considered to be wrong and improper. This was enough to commence the running of the statute of limitations. *See Welcker, supra,* 752 F.2d at 1580. It is immaterial that the plaintiffs did not understand the entire reason for the adverse action. The fact is, they knew or should have known of their cause of action and use of the discovery process could or might have revealed evidence in support thereof. Consequently, the statute began to run on April 2, 1975, and the subsequent discovery of an allegedly false document in no way operated to toll the statute. Likewise, the plaintiffs' claim was not "inherently unknowable" since they should have been on notice of a breach of the future loans or advances clause by the defendant as soon as they were informed by the FmHA that their emergency loan application had been denied on April 2, 1975.

■ In sum, the plaintiffs' claim under the future loans or advances clause matured on April 2, 1975. As a result, the six-year statute of limitations commenced running on that date. Since the six-year statute of limitations applicable to actions commenced in the United States Claims Court is jurisdictional, the Court lacks the necessary jurisdiction to hear the plaintiffs' future advances clause contract claim. *See* 28 U.S.C. § 2501 (1982); *see also Soriano, supra,* 352 U.S. at 273–74, 77 S.Ct. at 272;

*Hopland Band of Pomo Indians v. United States,* 855 F.2d 1573, 1576–77 (Fed.Cir. 1988); *Japanese War Notes, supra,* 178 Ct.Cl. at 632, 373 F.2d at 358. Consequently, again, the plaintiffs have failed to state a claim which is within the jurisdiction of this Court.

Having concluded that none of the plaintiffs' claims are within the jurisdiction of this Court, it follows that the defendant's motion for summary judgment should be granted and the plaintiffs' complaint should be dismissed. Since the Court lacks jurisdiction over the plaintiffs' cause of action, the Court must also dismiss, as having no independent jurisdictional status, the defendant's counterclaim herein. *See Somali Development Bank, supra,* 205 Ct.Cl. at 743, 752, 508 F.2d at 818, 822; *Nutt, supra,* 12 Cl.Ct. at 356.

## CONCLUSION

For the reasons discussed herein, the defendant's motion for summary judgment is granted and the plaintiffs' complaint is to be dismissed. Likewise the defendant's counterclaim is to be dismissed. Therefore, the clerk is directed to enter judgment dismissing the plaintiffs' complaint and the defendant's counterclaim.

Each party is to bear their own costs.